Lisa R. Petersen (7598)
Brenda E. Weinberg (16187)
Amy L. Herrington (18695)
COHNE KINGHORN, P.C.
111 East Broadway, 11th Floor
Salt Lake City, Utah 84111
Telephone: (801) 363-4300
Facsimile: (801) 363-4378
Email: lpetersen@ck.law
       bweinberg@ck.law
       aherrington@ck.law

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JERRY BOVEE, <br><br> *Plaintiff,* <br><br> v. <br><br> UTAH STATE UNIVERSITY, ELIZABETH R. CANTWELL, DIANA SABAU, MICA MCKINNEY, <br><br> JOHN AND JANE DOES 1-10, <br><br> *Defendants*. | **VERIFIED COMPLAINT** <br><br> Civil No. _____ <br><br> Judge: _____ <br><br> **JURY DEMAND** |

Plaintiff Jerry Bovee ("Mr. Bovee" or "Plaintiff"), by and through counsel, hereby complains and alleges against defendants Utah State University ("USU"), Elizabeth R. Cantwell ("Cantwell"), Diana Sabau ("Sabau"), and Mica McKinney ("McKinney") (collectively, the "Defendants") as follows:

## NATURE OF CASE

1.      This case revolves around a public university, USU, that has egregiously and continuously failed to meet the requirements of Title IX for more than a decade. Indeed, USU has developed an unfortunate reputation for its failures in responding to reports of sexual misconduct and sexual assault—so much so that it has garnered the attention of the United States Department of Justice ("DOJ"), which has maintained a mandatory presence on campus since 2017, investigating USU's widespread Title IX issues going back to 2013. After years of failures and noncompliance with the requirements of both Title IX and its own Settlement Agreement with DOJ, rather that address those issues head-on, USU leaders then sought to avoid blame by passing it on to a few members of the Athletic Department—including Jerry Bovee, who wasn't even employed at USU during the events that were the subject of the Settlement Agreement with DOJ. Throughout his tenure as the Athletic Director of Weber State University and as the Associate Vice President and Deputy Athletic Director of USU, Mr. Bovee maintained a professional and ethical conduct record and, prior to Diana Sabau's arrival, received nothing but repeated praise for his performance. In the entirety of his 30-plus year career, Mr. Bovee had never been the subject of any disciplinary action or accusation of misconduct of any kind. But when the opportunity presented itself, USU leaders, instead of accepting responsibility for their own actions and failures, forced Mr. Bovee to unwittingly take the fall for their own prior transgressions.

2.      Despite Mr. Bovee's impeccable record, he faced documented and targeted hostility from Sabau, his direct supervisor, who made it clear that she wanted a reason to terminate him for cause. Under the looming threat of discipline from DOJ for continued noncompliance, and Mr. Bovee's numerous complaints of Sabau's workplace hostility, USU,

2

Sabau, Cantwell, and McKinney capitalized on Sabau's hostility toward Mr. Bovee by scapegoating and retaliating against him. They terminated his employment and publicly disparaged him, blaming him in the news media for USU's many years of mishandling sexual assault cases across many different departments, and its own continued failure to meet deadlines imposed by DOJ related to Title IX compliance.

## PARTIES

3.    Mr. Bovee is an individual who resides in Cache County, Utah, and who was employed by USU as Associate Vice President and Deputy Athletic Director from May 28, 2019, through November 1, 2022, and again between August 21, 2023, and July 2, 2024. He also served as the Interim Athletic Director from November 1, 2022, through August 21, 2023.

4.    Defendant USU is an institution of higher education formed and existing under Utah Code § 53B-2-101, with its principal office located in Cache County, State of Utah.

5.    Defendant Cantwell has been the President of USU since August 1, 2023. Upon information and belief, Cantwell is a resident of Cache County, Utah.

6.    Defendant Sabau has been USU's Vice President and Athletic Director since August 7, 2023. Upon information and belief, Sabau is a resident of Cache County, Utah.

7.    Defendant McKinney has been USU's Vice President of Legal Affairs and General Counsel since January 2016. Upon information and belief, McKinney is a resident of Cache County, Utah.

8.    JOHN AND JANE DOES 1-10 are defendant individuals and/or entities whose true names are unknown, but who were involved in the conduct described herein and are liable for the claims for relief detailed herein.

3

## JURISDICTION AND VENUE

9.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, under

Title IX, 20 U.S.C. § 1681 *et seq*.; 34 C.F.R. § 106.71; and 42 U.S.C. § 1983.

10.      The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over

Plaintiff's claims for defamation, false light, breach of contract, tortious interference with

existing economic relations, tortious interference with prospective economic relations,

deprivation of property and liberty interest without due process in violation of Article I, Section

7 of the Utah Constitution, and action for declaratory relief because the facts giving rise to these

claims form part of the same case or controversy as Plaintiff's retaliation claim under Title IX

and Plaintiff's deprivation of property and liberty interest without due process in violation of 42.

U.S.C. § 1983 claims.

11.      The Court has personal jurisdiction over Defendants because Defendants reside in

Utah, are incorporated in Utah, or their contacts with Utah gave rise to Plaintiff's claims.

12.      Venue in this Court is proper under 28 U.S.C. § 1391(b) because a substantial part

of the acts or omissions giving rise to the claims alleged herein occurred within this judicial

district, and Defendants are subject to personal jurisdiction here.

13.      Mr. Bovee has taken steps to exhaust his administrative remedies, if any, before

filing this suit.

14.      Mr. Bovee has complied with the requirements of the Governmental Immunity

Act, Utah Code § 63G-7-101 *et seq*. He submitted a Notice of Claim on November 19, 2024, to

all relevant Defendants in this action and followed all necessary procedural steps required by

statute.

## GENERAL ALLEGATIONS

### A.    USU'S Longstanding History of Sexual Misconduct and Title IX Issues.

15.    USU has a well-known sordid history of Title IX compliance issues—which go beyond issues in just the football program or athletics—and which predate any involvement Mr. Bovee had as an employee at USU and the Athletics Department at USU.

16.    This history includes a pattern of shielding its own staff from accountability for perpetrating or ignoring known instances of sexual misconduct—including allowing professors accused of rape to quietly resign—and yet curiously not making any public statements condemning this misconduct or acknowledging its own institutional failures, prior to publicly vilifying a recently-hired employee with an unblemished 30-year career who alleged workplace hostility.

17.    In November 2016, then-student, Victoria Hewlett ("Hewlett"), filed a lawsuit against USU alleging she was raped by fellow USU student and member of the Sigma Chi fraternity, Jason Relopez, for USU's failure to act on five other female's reports that Relopez had sexually assaulted them prior to his assault on Hewlett. *See* SALT LAKE TRIBUNE article dated Nov. 8, 2016, attached hereto as Exhibit "1."

18.    In July 2018, Hewlett and USU entered into a public settlement, which included terms requiring USU to revise policies and implement new trainings to adequately respond to reports of sexual misconduct. *See* SALT LAKE TRIBUNE article dated July 5, 2018, attached hereto as Exhibit "2"; SALT LAKE TRIBUNE opinion column dated July 5, 2018, attached hereto as Exhibit "3."

4913-4332-5719, v. 6

19.    Upon information and belief, USU never released the names of (let alone publicly maligned) the employees who participated in, failed to report, or failed to act on these reports of sexual assault.

20.    Upon information and belief, USU did not terminate the employment of (let alone publicly malign) any of the employees who participated in, failed to report, or failed to act on these reports of sexual assault.

21.    In another instance, at the beginning of 2018, numerous complaints surfaced on social media about USU's piano program and its head piano instructor, Gary Amano, ranging from assault to hostile-environment harassment. *See* INSIDE HIGHER ED article dated Apr. 8, 2018, attached hereto as Exhibit "4."

22.    In April 2018, an outside investigator provided a report which found that Amano had discriminated against women in the department for over a decade and ***expressly recommended Amano's dismissal*** on the grounds that he "created a hostile academic environment for women," and that he "tolerated sexual harassment of students by faculty members he was supposed to be supervising, without holding those faculty members accountable." *Id.* at pg. 3.

23.    Following the release of this report, and despite the ***report's recommendation to terminate his employment***, USU allowed Gary Amano to retire rather than be terminated. *See id*.

24.    USU launched a second investigation into the piano department in September 2018, after a former student filed a civil lawsuit against music professor Dennis Hirst, alleging that he raped her when she was his seventeen-year-old student. *See* HERALD JOURNAL NEWS article dated July 14, 2021, attached hereto as Exhibit "5."

6

25.     USU told the university community on September 26, 2018, that it hoped the investigation would only last a few weeks. The investigation did not conclude until 2020. *See id*.

26.     USU never publicly released the results of the investigation to the media and refrained from making any public comments whatsoever regarding the Dennis Hirst investigation until July 14, 2021, when USU Associate Vice President for Strategic Communications Amanda DeRito ("DeRito") released limited comments to the press—stating only that Dennis Hirst (an alleged rapist) was allowed to submit his resignation from USU on June 30, 2021, in lieu of having USU sanctions imposed on him. *See id*.

27.     DeRito, who is still employed at USU, noted that "USU tried to balance protecting private information with the need to 'provide clarity about our process.'" *Id.* at pg. 3.

28.     After determining that Hirst had violated USU policy—USU stated that it reached a settlement with Dennis Hirst by relying on the provisions of USU Policy 407, which provide that a faculty member may request a conference with the provost to attempt to reach a settlement as opposed to being sanctioned for misconduct. *See id*.

29.     In 2016, McKinney, General Counsel at USU, was tasked with investigating USU's failures related to Title IX processes and procedures after several female students told USU employees, who were mandatory Reporting Employees, that they were sexually assaulted by the same football player, Torrey Green—who was later convicted of raping all three women. *See* SALT LAKE TRIBUNE article dated August 24, 2018, attached hereto as Exhibit "6"; DESERET NEWS article dated Nov. 5, 2019, attached hereto as Exhibit "7."

30.     USU filed a lawsuit seeking to block the release of the findings of McKinney's 2016 investigation, and, in fact, refused to release the findings of McKinney's investigation until

7

it was required to do so as the result of the settlement of the lawsuit. *See* SALT LAKE TRIBUNE article dated March 23, 2017, attached hereto as Exhibit "8"; *see also* Ex. 6 at pg. 2.

31.    On August 24, 2018, as a result of the lawsuit's settlement, USU released the findings of McKinney's 2016 investigation. *See* "Update on 2016 Recommendations to Improve Sexual Violence Prevention and Response at Utah State University," attached hereto as Exhibit "9."

32.    McKinney's findings reported that multiple employees at USU, who were required to report when they learned of these possible instances of sexual misconduct, failed to report as required. *See* Ex. 6; Ex. 9.

33.    Upon information and belief, USU never released any of the names of the employees who failed to report or act (let alone publicly maligned those employees).

34.    Upon information and belief, none of the employees who failed to report or act were terminated from employment or subjected to public comment by USU.

35.    Indeed, based on these instances, and numerous others, of USU's failures to respond to sexual misconduct reports, DOJ has maintained an investigatory presence at USU since January 12, 2017, when it informed USU that it was initiating an investigation into the university's responses to reports of student-on-student and employee-on-student sexual harassment, including sexual assault, between 2013 and 2017. *See* redacted[1] copy of the October 2, 2019 U.S. Department of Justice Report ("2019 DOJ Report"), attached hereto as Exhibit "10."

36.    On October 2, 2019, after a nearly three-year investigation into USU's practices, DOJ released a condemnatory report, concluding that USU repeatedly mishandled cases of

---

[1] The only version of the 2019 DOJ Report that the DOJ has made available has been redacted pursuant to FERPA requirements.

sexual assault on campus and *failed to investigate* when it knew about misconduct. *See generally,* Ex. 10.

37.    The 2019 DOJ Report provided that its investigation uncovered significant failures in how USU responded to complaints, particularly with regard to USU's treatment of fraternities, the music department, and football players. *See generally, id.*

38.    In summary, DOJ's investigation revealed that from 2013 to 2017, "USU did not comply with Title IX and its implementing regulations in key respects, including by *failing to investigate and resolve sexual harassment of which it had notice*, often leaving the complainant, and the larger community, vulnerable to sexual harassment." *Id.* at pgs. 2-3 (emphasis added).

39.    According to the 2019 DOJ Report, since 2013, USU received *two hundred forty* (240) reports of sexual misconduct—around fifteen (15) of which involved football players—but processed *fewer than twenty-five* (25) (approximately 10%) of the reports in accordance with its Title IX procedures. *See id.* at pg. 7.

40.    The 2019 DOJ Report also found that "[i]n numerous instances, *USU failed to investigate complaints or investigated inadequately*." *Id.* (emphasis added).

41.    On February 11, 2020, USU and DOJ entered into a Settlement Agreement (the "DOJ Agreement"), which required USU to respond promptly, equitably, and adequately to known sexual harassment that has created a hostile environment. *See generally* DOJ Agreement, attached hereto as Exhibit "11."

42.    The DOJ Agreement also provided that there would be federal monitoring of USU's compliance with the DOJ Settlement requirements through the 2022-2023 school year. *See id.* at pgs. 21-24.

43.    On May 6, 2024, DOJ issued a Notice of Extension of the DOJ Agreement, providing that the Parties agreed to extend the DOJ Agreement through the 2024-2025 academic year.

44.    On August 21, 2024, DOJ issued a report titled "Compliance Monitoring of [DOJ Agreement]," (the "Noncompliance Report") which noted numerous instances of USU's noncompliance with the terms and requirements of the DOJ Agreement. *See* Noncompliance Report, attached hereto as Exhibit "12."

45.    The Noncompliance Report relied on a recent independent review and investigation by the DOJ to find that ***USU has failed to develop policies and procedures regarding communication between the Office of Equity and the Athletics Department on Title IX matters, has failed to outline criteria and a process for the Office of Equity and the Athletics Department to determine appropriate measures during the Title IX investigation and adjudication process, has failed to properly train athletic staff on the Student Athlete Handbook, and has failed to adhere to its own policies****. See id.* at pgs. 9-11, 13 (emphasis added).

**B.    USU Hires Mr. Bovee as Associate Vice President and Deputy Athletic Director.**

46.    On May 28, 2019, Mr. Bovee began working for USU as the Associate Vice President and Deputy Athletic Director; prior to that, he had spent the past ten (10) years as the Athletics Director at Weber State University.

47.    On November 1, 2022, Mr. Bovee was appointed Interim Athletics Director after the resignation of the current Athletic Director, John Hartwell. In announcing Mr. Bovee's appointment, then-USU President Cockett said, "We are fortunate to have someone of Jerry's

caliber to seamlessly transition our athletic department. There is no one better prepared to provide the needed leadership and stability as we move to the next chapter in Aggie Athletics."

48.    Mr. Bovee again took the position as Associate Vice President and Deputy Athletic Director after Sabau's appointment as Director of Athletics on August 7, 2023.

49.    Mr. Bovee served USU with dedication and integrity, consistently upholding the values and policies of USU. Throughout his tenure, he maintained a professional and ethical conduct record and, prior to working under Sabau, received nothing but consistent praise for his performance.

50.    Mr. Bovee has never, in the entirety of his 30-plus year career, been the subject of *any* disciplinary action or accusations of misconduct of any kind.

51.    *All of the shocking incidents* which are the subject of the 2019 DOJ Report regarding USU's Title IX failures occurred *prior to* Mr. Bovee's employment at USU in 2019.

52.    On information and belief, USU hired Mr. Bovee in 2019, in part, precisely because of his record with Title IX compliance and his reputation for fostering safe and inclusive academic environments at prior institutions—with the hope that he could help USU improve its reputation and Title IX-related processes in response to its history of public failings and compliance issues with Title IX and DOJ.

53.    Mr. Bovee's commitment to USU and its student athletes has been unwavering, and he has always endeavored to create a positive, safe, and inclusive environment.

54.    Mr. Bovee has always been a supporter of Title IX and its goals, not only with regard to prohibiting sexual misconduct, but with regard to the promotion of female athletes.

55.    During his 10 year tenure as Director of Intercollegiate Athletics at Weber State, Mr. Bovee invited Brenda Tracy, a national advocate dedicated to ending sexual violence, to

speak and educate student-athletes, coaches, staff, and the community about school policies and Title IX.

56.    At USU, Mr. Bovee was part of the leadership team that brought former sports broadcaster, speaker, author, and founder of Changing the Narrative, Rachel Joy Baribeau, to speak about positive mental health and ending domestic violence and social injustice.

57.    Mr. Bovee led efforts to induct an all-women class into the 2023 USU Athletics Hall of Fame in celebration of the 50th Anniversary of Title IX, which included *A Celebration of Women in Sports* gala where speakers raised funds for a new *Women's Excellence Scholarship Endowment* to support future female student-athletes at USU. This scholarship now provides USU female athletes with over $50,000 in scholarship funds every year. *See* THE UTAH STATESMAN article dated April 10, 2023, attached hereto as Exhibit "13."



58.    When Mr. Bovee suggested the idea for the 50th Anniversary of Title IX gala, celebrating an all-women class of Hall of Fame inductees, he received pushback— particularly from a well-known major donor.

59. Despite the pushback, Mr. Bovee, along with Amy Crosbie ("Crosbie"), then-Executive Associate Athletic Director and Senior Woman Administrator at USU, continued to champion the gala event, which was ultimately extraordinarily successful and brought in ample donor funds, even from the major donor who had previously voiced dissatisfaction with the idea.

60. Despite his track record for supporting Title IX initiatives, Mr. Bovee's employment with USU was summarily terminated for purported "severe cause" for alleged violations of USU's Title IX policies on July 2, 2024.

### C.    USU Ignores Diana Sabau's Abusive Treatment of Mr. Bovee in the Workplace.

61. On August 7, 2023, USU hired Sabau as USU's Athletic Director.

62. From August 7, 2023, until his termination, Mr. Bovee, as the Deputy Athletic Director, reported directly to Sabau, who was the Vice President and Director of Athletics.

63. Mr. Bovee also reported to Cantwell, USU's President, from August 1, 2023, until his termination.

64. Sabau was hostile toward Mr. Bovee and others from the beginning of her tenure.

65. Upon information and belief, at least some of this hostility was due to Mr. Bovee's distinguished role in the community.

66. Mr. Bovee is a USU alum.

67. Upon information and belief, Sabau perceived that many donors, season ticket holders, and supporters were displeased that Sabau was named the Athletic Director instead of him, after Mr. Bovee served favorably as the interim Athletic Director for the previous ten months.

68. Indeed, when donors and athletes were complimentary of Mr. Bovee and his work for USU, Sabau would become irritated and contentious with Mr. Bovee.

13

69.     Throughout Mr. Bovee's time working under Sabau, she was continuously overly critical, insulting, and abusive toward him and others he supervised and managed.

70.     On numerous occasions, Sabau leveled accusations at Mr. Bovee that he was overpaid, that he was not good at his job, and that he needed to "own his job" (suggesting that he did not take his job seriously).

71.     From August of 2023 to June of 2024, Sabau surreptitiously took job duties away from Mr. Bovee—many of which he had since joining USU in 2019—such as assisting with the scheduling and contracting of the football schedule, traveling with the football team, fundraising responsibilities, and overseeing the marketing and creative team.

72.     Upon information and belief, Sabau was trying to minimize Mr. Bovee's role and push him out of his position.

73.     For instance, during a meeting on October 24, 2023, with Sabau, Mr. Bovee, and the external staff that Mr. Bovee oversaw, Sabau aggressively interrupted and undermined Mr. Bovee, was belligerent toward him, and questioned his work.

74.     Following the meeting, Mr. Bovee received numerous questions and concerns from external staff members regarding Sabau's treatment of him, and specifically, many noted that her treatment of him differed from her treatment of others.

75.     In another meeting on November 14, 2023, with Sabau, Amy Crosbie ("Crosbie"), then-Executive Associate Athletic Director and Senior Woman Administrator at USU, and Mr. Bovee, Sabau yelled aggressively at Crosbie and Mr. Bovee for hiring an Assistant Coach without seeking Sabau's approval.

76.     Sabau's conduct during this meeting was so abusive that Crosbie began to get emotional, to the point that Sabau brought Crosbie to tears. Sabau then mocked Crosbie.

4913-4332-5719, v. 6

77.     In his entire career, Mr. Bovee had never been yelled at or subjected to the kind of hostility Sabau leveled at Crosbie and him during this meeting.

78.     Sabau threatened "there will be an investigation" and told Mr. Bovee that "changes are coming"—a clear threat to his employment.

79.     Following the meeting, Mr. Bovee reached out to Human Resources and was emphatically told that "no policy had been violated" by his actions or Crosbie's decision to hire the Assistant Coach. The Human Resources representative further stated that there was no legal basis to disqualify the coaching candidate from consideration.

80.     Upon information and belief, Sabau was simply angry because Crosbie consulted with Mr. Bovee on the hire rather than with Sabau.

81.     In an effort to continue a reasonable working relationship with Sabau, Mr. Bovee met with Sabau the following day to apologize for how things had transpired, even though it was Sabau who should have apologized to Mr. Bovee and to Crosbie for her own misconduct. Rather than apologize or accept Mr. Bovee's apology, Sabau once again reiterated that "changes are coming," a statement she repeated to him multiple times in subsequent conversations.

82.     Based on her abusive conduct, mistreatment, insults, and veiled threats to his employment in these meetings and in countless other meetings and interactions between Sabau and him during the first few months of her tenure, Mr. Bovee began offering to resign and leave USU, as it appeared that this is what she wanted.

83.     Sabau repeatedly rebuffed Mr. Bovee's offers.

84.     While meeting with Sabau on November 15, 2023, Mr. Bovee offered to leave the department to allow her to hire her own Deputy Athletics Director.

15

85.    Sabau responded to Mr. Bovee's offer to leave the department by raising her voice, pointing at him, and saying, "You will leave when I say you'll leave."

86.    Sabau made clear that she would not allow him to resign—which Mr. Bovee is entitled to do in lieu of termination pursuant to University Policy 311.2.4.

87.    Upon information and belief, Sabau wanted to force his termination and to use it to her advantage.

88.    Upon information and belief, Sabau sought to avoid criticism from the community and the USU fan base that might arise if she simply allowed Mr. Bovee to resign. Instead, she used misleading and unfounded justifications for Mr. Bovee's termination in an effort to control the narrative surrounding his departure.

89.    Upon information and belief, this was done with the intent to assist both herself and USU in tarnishing Bovee's reputation, thereby reducing potential negative backlash from the community. It is also apparent that Sabau, Cantwell, and McKinney further used Mr. Bovee as a scapegoat for USU's continuing failure to investigate reports of sexual misconduct and the impending report of noncompliance with the DOJ Agreement.

90.    On December 8, 2023, Mr. Bovee met with Lisa Leishman and Becca Seamons in Human Resources regarding Sabau's inappropriate behavior, the diminished culture and morale in the athletics department under her leadership, and his concerns that many staff have described the Department as "toxic" and "hostile" since Sabau joined the Department—a description that Mr. Bovee agreed with and personally experienced.

91.    Mr. Bovee informed Human Resources that Sabau was more abusive toward him than she was toward others in the Department, and that he had been approached by many staff members who had noticed this differential treatment.

16

92.    Mr. Bovee also told Human Resources that he felt Sabau did not want him in the Department, and that Mr. Bovee anticipated she was looking for reasons to terminate his employment.

93.    During this meeting, Mr. Bovee was informed that other staff members had reported similar complaints to Human Resources.

94.    At the conclusion of this meeting, Mr. Bovee was offered only three options: first, do nothing and go back to work; second, confront Sabau with the concerns directly; or third, take it to Sabau's supervisor—USU President Cantwell.

95.    Based on all of his interactions with Sabau, Mr. Bovee did not think that the second or third options would be productive because Sabau would simply retaliate against him, so Mr. Bovee went back to work with the caveat that if things did not improve, he would return to Human Resources.

96.    Mr. Bovee has learned since this meeting that the staff at Human Resources discussed his complaint with Sabau.

97.    Mr. Bovee was informed by athletics staff members that, following his meeting with Human Resources on December 8, 2023, Sabau began reassigning more duties from his job description to other staff members. These duties included oversight of the external multimedia rights partnership, which encompasses sales and fulfillment operations contracted with Learfield.

98.    Sabau never told Mr. Bovee that she was offloading his job duties to other staff members.

99.    Between December 2023 and July 2024, Mr. Bovee informally met with Human Resources staff members on a few different occasions regarding Sabau's abusive conduct toward him and the hostile work environment she had created in the Department.

17

100.    In August of 2023, President Cantwell had given Mr. Bovee a $50,000 annual raise in pay.

101.    President Cantwell never stated to Mr. Bovee that his raise in pay was temporary, conditional, or for a one-year time period.

102.    Around the middle of June 2024, Sabau called Mr. Bovee on the phone to inform him that he was receiving a pay cut—a reduction of $50,000 annually (the same amount as the pay raise he had received approximately one year earlier).

103.    Sabau represented to Mr. Bovee, without evidence or support, that his raise of $50,000 was for one year only.

104.    Mr. Bovee informed Sabau that he had never been informed by President Cantwell or anyone else that his raise would be revoked or would expire after one year.

105.    Sabau stated that since she was not at USU at the time and thus not involved in the decision to increase his salary, he would have to discuss it directly with President Cantwell.

106.    Contrary to her statement, Sabau had previously sent a text message to Mr. Bovee in August 2023 stating that she was indeed part of the decision with President Cantwell to give Mr. Bovee a pay raise and that she was in "lock step" agreement with the President on the raise. And nothing in her text message stated that the raise was for one year only. A true and correct copy of this text message is attached hereto as Exhibit "14."

107.    Mr. Bovee later complained to President Cantwell that his pay was being cut by $50,000. President Cantwell responded: "Jerry, sometimes I'm not sure I'm even the President."

108.    After Sabau's abusive treatment of him and her actions to take away many of his job duties, Sabau's decision to reduce Mr. Bovee's salary by $50,000 made clear that her abuse

18

was personal against him and that at some point she would seek to terminate his employment, setting him up for a "for cause" termination.

109.    On Friday, June 28, 2024, Mr. Bovee told Human Resources that he needed to file a formal written grievance against Sabau for her mistreatment and abuse toward him, for creating a hostile work environment, and for her retaliation against him.

110.    Human Resources told Mr. Bovee that no one in the office was available to meet with him to file such a complaint until Tuesday, July 2, 2024. Mr. Bovee made an appointment to meet with Human Resources at 12:00 pm on Tuesday, July 2, 2024.

### D.    USU Terminates Mr. Bovee Publicly Just Hours Before His Scheduled Meeting to File a Complaint Against Sabau.

111.    Mr. Bovee had another appointment outside the office on the morning of July 2, 2024. While *en route* to file a formal complaint against Sabau at his noon meeting with Human Resources, Mr. Bovee's wife called to tell him that she saw a USU posting on X, linked to a statement on USU's website, providing that Mr. Bovee had been terminated for "severe cause" from USU.

112.    As of 11:38 am on July 2, 2024, the post had already received at least 15,600 views:



113.    When Mr. Bovee arrived for his appointment at Human Resources moments later, Doug Bullock, Director of Human Resources, handed Mr. Bovee a printed copy of an email from Sabau, which Mr. Bovee had not yet seen, terminating Mr. Bovee for purported "severe cause"; preventing him from filing the formal written complaint against Sabau while he was still employed at USU.

114.    Nevertheless, Mr. Bovee filed a formal written grievance regarding Sabau's abusive treatment and retaliation against him using the appropriate Human Resources channel, Ethics Point, on July 26, 2024. *See* copy of Mr. Bovee's formal written grievance, attached hereto as Exhibit "15."

### E.    The Pretextual Basis for Mr. Bovee's "Severe Cause" Termination.

115.    Nearly *15 months earlier*, on April 12, 2023, Coach Blake Anderson ("Anderson") called Mr. Bovee on his cell phone to inform him that a Student Athlete[2] had been

---

[2] For purposes of protecting the identity of the student involved, this Complaint will simply refer to the individual as "Student Athlete."

arrested on April 5, 2023, for allegations of domestic or relationship violence. At the time, Mr. Bovee was serving as Interim Athletic Director.

116.    University Interim Policies 339, 339A, and 340 state that Reporting Employees (which Mr. Bovee was as Interim Athletic Director), must report Sexual Misconduct to the USU Title IX Coordinator within twenty-four (24) hours of a disclosure of sexual misconduct.

117.    Mr. Bovee—within hours of receiving the phone call from Anderson on April 12, 2023—communicated this information to Crosbie and to Eric Olsen ("Olsen"), then-interim Director of Student Affairs at USU.

118.    Because all three were "Reporting Employees" as defined by USU policy, they determined that Olsen would submit an online Incident Report ("IR") on behalf of all three of them to the Title IX Coordinator.

119.    Interim University Policy 340, § 2.1.1 states, "A single Incident Report can be submitted by an individual Reporting Employee or **_multiple Reporting Employees_**, as long as all Reporting Employees are named on the Incident Report and every Reporting Employee has provided all information known in the Incident Report concerning the Sexual Misconduct." (Emphasis added.)

120.    Mr. Bovee provided Olsen with all information known to him on April 12, 2023, related to the Student Athlete's arrest to be included in the IR.

121.    On April 12, 2023, the same day that Mr. Bovee was first informed of the Student Athlete's arrest by Blake Anderson, and well within the required 24-hour time period, Olsen submitted the IR required by Interim University Policy 340, § 2.1.1 on behalf of himself, Crosbie, and Mr. Bovee.[3]

---

[3] USU has refused, despite multiple requests, to provide Mr. Bovee with a copy of his own IR. However, USU has confirmed that it was submitted on his behalf by Eric Olson on April 12, 2023. *See infra*, ¶ 163; and Ex. 20.

122.    The IR included all information known to Mr. Bovee at that time related to the Student Athlete's arrest.

123.    Even if Mr. Bovee had wanted to supplement the IR after submitting it, USU's software application for submitting IRs does not allow Reporting Employees to add to or supplement the IR after it is filed.

124.    On information and belief, the USU Office of Equity *never* conducted the required Title IX investigation into the alleged incident which he reported on April 12, 2023.

125.    On information and belief, the Office of Equity *never* interviewed either the Student Athlete or the individual who allegedly experienced the sexual misconduct.

126.    Based on USU's training of Mr. Bovee and Mr. Bovee's experience with submitting previous IRs at USU, a Reporting Employee's duty is to simply submit the initial IR and allow the Office of Equity to follow-up with the Reporting Employees as part of the investigation.

127.    Indeed, USU employees, including Mr. Bovee, are trained to stay out of, and not interfere with, the Office of Equity's Title IX investigations, and to only respond to inquiries or requests for interviews or information from the Office of Equity.

128.    Mr. Bovee did not conduct or facilitate any "independent investigation" into the allegations against the Student Athlete. He did not communicate with the Student Athlete, the individual who allegedly experienced the sexual misconduct, or any alleged witnesses. He did not seek to obtain, nor did he obtain, any statements directly from any of those individuals.

129.    No one from the Office of Equity ever told Mr. Bovee that he had failed to cooperate with their processes, that he had interfered with their processes, or that the information he had provided in the IR was incomplete.

22

130.    The Office of Equity *never* followed up with Mr. Bovee about the IR in any way after Olsen filed the IR on his behalf.

131.    USU's Office of Equity never interviewed Mr. Bovee in connection with any investigation into the April 5, 2023, allegations involving the Student Athlete, which Mr. Bovee did not learn about until April 12, 2023, the same day he reported it to the Office of Equity.

132.    After filing the IR on April 12, 2023, Mr. Bovee and Mr. Olsen sought to determine whether criminal charges had been filed against the Student Athlete, in order to determine whether immediate athletic suspension of the Student Athlete was warranted pursuant to the Student Athlete Handbook.

133.    As of April 12, 2023, Mr. Bovee and Olsen could not see that any charges had been filed against the Student Athlete.

134.    The Student Athlete was injured at the time and was not participating in Spring Training or team activities during April of 2023. The only activities from which Mr. Bovee could have suspended Student Athlete in the 5 calendar days (Wednesday through Monday) between learning of the allegations and the Student Athlete's entry to the Transfer Portal were practice, play, training, or team activities—none of which Student Athlete was participating in during April of 2023.

135.    Because no charges had been filed and because the Student Athlete was not participating in any team practice, play, training, or activities, Coach Anderson and Mr. Bovee could not suspend the Student Athlete from athletics.

136.    Neither Coach Anderson nor Mr. Bovee had the authority to suspend a student from campus or from enrollment.

137.    On either the morning of April 13, 2023, or April 20, 2023, USU's Title IX Safety Panel (who works in conjunction with USU's Office of Equity), made an independent determination that the Student Athlete "did not pose a threat to the campus community."

138.    Mr. Bovee was not a member of the Title IX Safety Panel, nor was he invited to participate in, or provide information to, that committee, even though he was one of the three individuals who reported the allegations.

139.    On April 14, 2023, Mr. Bovee learned that the Student Athlete had informed the USU Compliance staff that he was entering the NCAA transfer portal to transfer to another university.

140.    Five days after Mr. Bovee filed the IR, on April 17, 2023, the Student Athlete officially entered the NCAA Student Transfer Portal.

141.    Mr. Bovee had no control over, or involvement in, whether any Student Athlete entered the Transfer Portal.

142.    Once a Student Athlete enters the NCAA Student Transfer Portal, the Student Athlete is immediately removed from team play, practice, training, and activities.

143.    On information and belief, the Student Athlete did not ever transfer to another school in 2023.

144.    On information and belief, although the Student Athlete did not participate in athletics, he was allowed by the USU Office of Equity, the USU Office of Student Affairs, and the USU Provost to continue as a matriculated student at USU through 2023, ***without any investigation*** into his alleged conduct.

145.    Mr. Bovee had no involvement in or authority over whether a student is suspended from school or is allowed to continue to be enrolled as a student.

146.    On information and belief, approximately one year later, the Office of Student Affairs and/or the Provost at USU subsequently allowed the Student Athlete to graduate from USU, despite being short of the requisite number of credits required to graduate.

147.    On information and belief, no investigation into the Student Athlete incident was ever done by USU's Office of Equity, even though Mr. Bovee had brought the incident to light through filing an IR on April 12, 2023.

148.    Ironically, if Mr. Bovee, Mr. Olsen, and Ms. Crosbie had not filed the IR on April 12, 2023, no one at USU would have ever known of the allegations against the Student Athlete, and Mr. Bovee would likely still have his job today.

### F.    Husch Blackwell Report and USU's Handling of the Allegations Regarding the Student Athlete.

149.    For *nearly six months*, Mr. Bovee heard nothing more about the Student Athlete incident that Mr. Bovee had reported to the Office of Equity on April 12, 2023. Mr. Bovee assumed it had been fully investigated and resolved by the Office of Equity, as previous IRs he had submitted to the Office of Equity had been. (The Student Athlete was no longer participating in athletics, and so far as Mr. Bovee knew, he had been allowed to transfer to another school—even though, unbeknownst to Mr. Bovee, USU allowed the Student Athlete to remain enrolled through 2023 and 2024.)

150.    Nevertheless, nearly *six months* after submitting the IR, in October of 2023, after Sabau was hired and Mr. Bovee returned to the position of Deputy Athletic Director, Mr. Bovee was asked to participate in interviews with Husch Blackwell attorneys, Peter Land and Kristine Zayko, regarding the April 2023 Student Athlete report Mr. Bovee had made.

151.    Concerningly, Kristine Zayko was forced to resign as Acting General Counsel at Michigan State University in 2018 in the aftermath of the Larry Nassar sexual abuse scandal,

amid criticism of her handling of sexual misconduct claims at Michigan State. *See* ALM MEDIA article dated May 10, 2018, attached hereto as Exhibit "16."

152.    To be clear, the Husch Blackwell "investigation" was not the legally mandated Title IX investigation into the Student Athlete allegations that Mr. Bovee and others timely reported to the Office of Equity on April 12, 2023.

153.    Rather, USU had retained outside counsel, not to investigate a good faith Title IX Report, but to investigate its own Athletic Department's reporting and handling of the Student Athlete (the very department that had brought the incident to light).

154.    Indeed, rather than conducting the required Title IX investigation based on the IR that Mr. Bovee had submitted, USU hired Husch Blackwell *months* after the IR was filed to review and investigate the conduct of the very employees who timely and properly reported the incident to the Office of Equity on April 12, 2023.

155.    Mr. Bovee met with the Husch Blackwell attorneys a total of three times to provide information about the incident and the IR that he caused to be filed. He met with the attorneys on October 16, 2023, February 26, 2024, and approximately one week after the second interview (which was at Mr. Bovee's request because he remembered some additional information that he asked to share with them).

156.    After his third interview, in February of 2024, *no one* at USU or Husch Blackwell reached out to him with any information or additional requests regarding the investigation.

157.    Indeed, for *five months*, Mr. Bovee did not hear anything else about the Husch Blackwell investigation until USU summarily terminated his employment on July 2, 2024.

158.    On July 2, 2024, Sabau emailed Mr. Bovee informing him that he was being terminated, attaching a termination letter (the "Termination Letter") and a portion of the Husch

26

Blackwell final report—including only Husch Blackwell's findings with regard to Mr. Bovee (the "Bovee Report")—as the basis for his termination. *See* copies of the email, the Termination Letter, and the Bovee Report, attached hereto as Exhibits "17," "18," and "19," respectively.

159.    To this day, Mr. Bovee has still not been given the opportunity to review the full Husch Blackwell final report ("Final Report") in its entirety.

160.    The Bovee Report that was provided to him on July 2, 2024, is dated July 1, 2024, and is replete with factual and analytical errors and gross inconsistencies and contradictions. *See generally*, Ex. 19.

161.    At no time prior to his termination was Mr. Bovee told that the Husch Blackwell investigation had been completed, that there was a report of any kind, and he was never given an opportunity to review or respond to the report.

162.    Within the Bovee Report, no dates or timelines of any kind are provided. No documents are referenced or attached, such as the IR, on which the Bovee Report's entire subject of timely reporting is based. *See generally, id.*

163.    The Bovee Report falsely asserts that Mr. Bovee  *See id.* at pgs. 1, 6 (emphasis added).

164.    Indeed, Mr. Bovee *did* cause to be submitted an IR within 24-hours after receiving the information related to the Student Athlete's arrest.

165.    Despite repeated requests, Mr. Bovee has still not been provided with a complete copy of his own IR submitted on April 12, 2023, although USU has confirmed that it was

27

submitted on his behalf on that date and that it exists. *See* Email from Matthew Pinner, Executive Director of Office of Equity, confirming that the IR was submitted on Mr. Bovee's behalf on April 12, 2023, attached hereto as Exhibit "20."

166.    Nothing in Interim University Policy 339 or Interim University Policy 340 requires an employee to file the IR immediately—the IR simply must be submitted within twenty-four (24) hours of receiving the information, which is exactly what Mr. Bovee did. *See* Interim University Policy 339, § 2.3.2; Interim University Policy 340, § 2.1.1.

167.    The Bovee Report erroneously ███████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████ *See generally*, Ex. 19.

168.    The University Student Athlete Handbook and Interim University Policy 340, § 2.1.2 are in direct conflict on this point.

169.    The University Student Athlete Handbook provides that upon notification of a student athlete who is arrested, "the head coach has the institutional responsibility to report the arrest immediately to his sport supervisor so appropriate notice of the situation may be immediately forwarded to the Director of Athletics." And the "Director of Athletics, in consultation with the head coach and sport supervisor, will determine additional disciplinary action *based upon the individual circumstances of any misconduct*." *See* USU Student Athlete Handbook at pg. 5 (emphasis added), attached hereto as Exhibit "21."

170.    The Student Athlete Handbook also states that "individuals who engage in [sexual misconduct] may be subject to investigation and discipline through USU's Office of Equity, USU's Office of Student Conduct, and/or local law enforcement." *Id.* at pg. 6.

28

171.    On the day he submitted the IR, Mr. Bovee attempted, with Mr. Olsen, to determine whether the Student Athlete had been charged and the nature of the charges. That is exactly what he was supposed to do to be able to determine whether immediate suspension was necessary, consistent with the Student Athlete Handbook provisions on misconduct.

172.    The Bovee Report erroneously states that Mr. Bovee ████████████████████ ██████████████████████████████████████████████████ ████████████████████████ *See* Ex. 19 at pg. 2.

173.    That is simply false.

174.    Irrespective of Coach Anderson's activities—of which Mr. Bovee was not aware—Mr. Bovee himself did not engage in ***any*** investigation into the allegations regarding the Student Athlete.

175.    Mr. Bovee had nothing to do with Coach Anderson's interviews or meetings with the Student Athlete or the individual who allegedly experienced the sexual misconduct.

176.    Mr. Bovee never met or spoke to the Student Athlete.

177.    Mr. Bovee never met or spoke to the individual alleged to have experienced sexual misconduct.

178.    Mr. Bovee never met or spoke to any witnesses.

179.    Mr. Bovee never directly obtained any witness statements from those individuals.

180.    Mr. Bovee was unaware that Coach Anderson was speaking to any of those individuals, if indeed he was.

181.    Further, the Bovee Report erroneously criticizes Mr. Bovee for ████████████ ██████████████████████████████████████████████████████████

29

██████████████████████████████████████████████████

████ *Id.* at pgs. 2, 5.

182.    But this criticism contradicts the highly sensitive and confidential nature of Title

IX investigations. And, there is no statute or USU policy or procedure requiring, or even

suggesting, that Mr. Bovee should share the information with other administrators outside of the

Athletics Department.

183.    Mr. Bovee fulfilled his obligations—he reported the Student Athlete's arrest

incident to the Office of Equity within 24 hours and it was the Office of Equity's responsibility

to investigate from there.

184.    Indeed, if Mr. Bovee had not reported this, no one at USU may ever have learned

about the allegations and Mr. Bovee would likely still be employed at USU today.

185.    Ultimately, the Bovee Report determined that Mr. Bovee did not ██████████

██████████████████████████████████████████████████

██████████████████████████████████████████ *See generally*,

Ex. 19.

186.    Even so, the Bovee Report ***does not recommend terminating*** his employment;

nor does it recommend ***any disciplinary action*** against him. *Id.*

**G.    USU's Termination of Mr. Bovee's Employment.**

187.    On July 2, 2024, consistent with Sabau's prior threats, Mr. Bovee was terminated

via email presented to him at his scheduled meeting to file a complaint with Human Resources

against Sabau.

188.    He was also presented with a Termination Letter from Sabau and a copy of the

July 1, 2024, Bovee Report—which was written ***15 months after Mr. Bovee originally reported***

the allegations regarding the Student Athlete (who was allowed by USU to continue as a student and to graduate—without *any* investigation into his conduct, and despite his lack of the required number of credits—from USU earlier that year).

189.    The Termination Letter states that Mr. Bovee was being terminated for "severe cause" based on purported findings in the Bovee Report that Mr. Bovee "violated the letter and spirit of USU Policy 340." Ex. 18 at pg. 2.

190.    Further, the Termination Letter states that while his filing of the IR "technically complied with USU Policy 340, it was not consistent with the spirit of USU Policy 340, which expects employees to report directly to the Office of Equity, to do so in a timely manner, and to report *all* the information they know or have received about the alleged incident of sexual misconduct." *Id.* (emphasis in original).

191.    Further, the Termination Letter relies on the Bovee Report to argue that Mr. Bovee provided "limited and *potentially* misleading information to the Office of Equity via a group report," while participating in a separate investigation of the incident. *Id.* (emphasis added).

192.    Importantly, the Termination Letter—and the Bovee Report that it is premised upon—provide *zero evidence* or explanation to support that Mr. Bovee gave *any* misleading information to the Office of Equity at any point, let alone on April 12, 2023. *See generally*, Ex. 18; Ex. 19.

193.    The IR that was filed on Mr. Bovee's behalf contained *all* information and *every* fact that was known to him at the time it was submitted on *April 12, 2023*.

194.    Indeed, nothing in the Bovee Report indicates that Mr. Bovee had any additional information to provide to the Office of Equity at the time the IR filed and, importantly, this

is consistent with the fact that Mr. Bovee was ***never*** contacted by the Office of Equity to provide any additional information.

195.    The Termination Letter also states that his termination is in part based on his ***purported*** failure to perform his leadership duties in good faith by not immediately suspending the Student Athlete. Ex. 18 at pg. 3.

196.    The Student Athlete Handbook provides that when a Student Athlete is arrested, "The Director of Athletics, in consultation with the head coach and sport supervisor, will determine additional disciplinary action ***based upon the individual circumstances of any misconduct***." Ex. 21 at pg. 5 (emphasis added).

197.    Neither the University Student Athlete Handbook, nor any other policy manual or rule, requires the Athletic Department to suspend a student athlete accused of domestic violence or sexual misconduct from practice or play—the Student Athlete Handbook only provides that it is an option, in consultation with the football coach, and based on sufficient evidence.

198.    But Mr. Bovee was not allowed to conduct any independent investigation into whether the Student Athlete should be suspended because that would violate USU's Title IX policies. All he could do was what he did—determine whether charges had been filed against the Student Athlete (which, to his knowledge, they had not).

199.    And to be clear, Mr. Bovee had no authority to suspend the Student Athlete from USU generally. Only the Provost or the Office of Student Affairs can suspend a student from enrollment or from school. Mr. Bovee only had the ability to suspend the Student Athlete from play or practice, which the Student Athlete was already not doing, due to an injury, and could not participate in once he entered the NCAA student transfer portal on April 17, 2023

200.    Indeed, USU allowed the Student Athlete to hang around campus and to take classes for over a year after Mr. Bovee reported the allegations—without ever investigating these allegations—and allowed him to graduate even though he did not have enough credits to do so.

**H.    USU's Public Statements in the Media.**

201.    Well before Mr. Bovee learned of his own termination from USU, USU, Sabau, and Cantwell leaked news of his termination to the media and made false and misleading public statements that Mr. Bovee had been terminated for violating sexual misconduct policies.

202.    On July 2, 2024, in an email to faculty and staff regarding Mr. Bovee's termination, President Cantwell and Sabau stated: "Today's actions are the result of a thorough external investigation, and we believe the evidence demands immediate action. Our job is to fearlessly hold ourselves and others accountable for their conduct and to make sure that, for the sake of our students and our community, we are living the values of our university." *See* copy of this email from USU President Cantwell, attached hereto as Exhibit "22."

203.    Upon information and belief, USU had already leaked this misleading statement to the media. At 9:29 am on July 2, 2024—more than an hour before Sabau emailed Mr. Bovee his Termination Letter—the Salt Lake Tribune published the above statement by USU in an article reporting on Mr. Bovee's termination for "failures of professional responsibilities" and "violations of policies related to the reporting of sexual and domestic violence." *See* SALT LAKE TRIBUNE article dated July 2, 2024, attached hereto as Exhibit "23."

204.    At 11:54 am on July 2, 2024, USU then published the same misleading statement on its official USU website, again stating that Mr. Bovee was terminated for "violations of university policies related to the reporting of sexual and domestic violence and failures of

professional responsibilities." *See* Utah State University Athletics online statement dated 11:54 pm July 2, 2024, attached hereto as Exhibit "24."

205.    Even USU now admits that Mr. Bovee timely filed a report of sexual misconduct regarding the Student Athlete.

206.    As the individual who reported the allegations, Mr. Bovee lived the values of USU by bringing to light an alleged incident that USU would never have otherwise known about.

207.    It was USU—not Mr. Bovee—who allowed the Student Athlete to graduate over a year later with insufficient credits. And it was the Office of Equity—not Mr. Bovee—who wholly failed in its duties to promptly and thoroughly investigate the complaint of sexual misconduct that Mr. Bovee reported.

208.    No one in the Office of Equity has received any disciplinary action whatsoever for these failures.

209.    On July 26, 2024, Sabau stated publicly to the media that Mr. Bovee and others were fired "so that there is not a pervasive culture of sexual violence or domestic violence within any of our athletic departments." *See* Fox 13 article dated July 26, 2024, attached hereto as Exhibit "25."

210.    Sabau's statement blatantly implies that Mr. Bovee engaged in, or at least fostered a culture of, sexual and domestic violence.

211.    This is patently false.

212.    In the same news article, Sabau is quoted regarding Mr. Bovee: "Sometimes good people make bad decisions." *Id*.

213.    Despite Sabau's representations, Mr. Bovee, Crosbie, and Olsen were the only people to make the ***good decision*** to report the allegations of sexual misconduct. It is the Office

of Equity who made the decision to sit on the allegations and do nothing to investigate them, despite its legal mandate to do so under Title IX.

214.    On July 26, 2024, a different media source published another interview with Sabau, in which she stated that Mr. Bovee was terminated "so that Utah State is a safer place…we are creating a safe and healthy environment for our student athletes, our students on campus and our communities…we firmly support our employment actions." *See* CACHE VALLEY DAILY article dated July 26, 2024, attached hereto as Exhibit "26."

215.    Sabau's statement implies that Mr. Bovee constituted a safety risk at USU.

216.    In the same interview, Sabau again stated regarding Mr. Bovee: "sometimes good people make bad mistakes." *See id.* (providing audio of Sabau's statements in the interview).

217.    This is patently false.

218.    On August 1, 2024, Diana Sabau spoke at a press conference at the start of USU football's media day ("Media Day"). She specifically addressed USU's termination of Mr. Bovee's employment—stating that "these were people who made bad choices and bad decisions." *See* DESERET NEWS article dated August 1, 2024, attached hereto as Exhibit "27," and The Aggship transcript dated August 2, 2024, attached hereto as Exhibit "28."



35

219.    During Media Day, Sabau stated publicly regarding Mr. Bovee's termination: "It is getting and modernizing our athletics department to current social standards applicable, acceptable behaviors and being in alignment with the values of this community and our institution. This is not what I want, this is for the greater good as one institution…Please realize that young people's lives have forever been changed because of some actions of some people." Ex. 27 at pg. 5.

220.    On information and belief, Sabau was clearly implicating Mr. Bovee with this statement and suggesting that he was not acting with "acceptable behaviors" or according to "current social standards," that he was not aligned "with the values of the community," that he was bad for the institution, and that Mr. Bovee negatively impacted young people's lives.

221.    This is patently false.

222.    During Media Day, Sabau stated publicly that DOJ has "lived" on USU's campus since 2020 "because of crimes within the football program, and will continue to do so for another year because there has not been improvement" in the program's culture. *Id.* at pg. 3.

223.    This is also false. In truth, DOJ has maintained a mandatory investigative presence on USU's campus since January 2019 because of USU's pervasive failure to respond to reports of sexual misconduct occurring across multiple departments and programs, including the music department and the Greek system.

224.    As Sabau alluded to in her public media statements, DOJ has been, and still is, engaging in reviews and investigations into USU's responses to reports of sexual misconduct and non-compliance with the requirements of Title IX.

225.    USU also represented in a public statement, responding to the Noncompliance Report, that DOJ made its own conclusions that Mr. Bovee had violated USU Policy and acted

36

improperly and that "USU agrees with the Department's conclusions." *See* USU's Response to Notice of Noncompliance related to USU Football Program ("USU Response") at pgs. 1-2, attached hereto as Exhibit "29."

226.    This is untrue—the Noncompliance Report specifically explains that its conclusions regarding Mr. Bovee's purported conduct and termination are derived only from the Husch Blackwell Final Report. *See generally*, Ex. 12.

227.    On the contrary, DOJ's findings in the Noncompliance Report with regard to USU administration's and the Office of Equity's failures are derived from DOJ's independent investigation and review of records. *Id.*

228.    Despite DOJ's findings in the Noncompliance Report that specifically outline the ***Office of Equity's "failure to promptly and effectively respond***" to the Student Athlete incident reported by Mr. Bovee's, Crosbie's, and Olsen's IR, (*see id.* at pgs. 9-11), no one from the Office of Equity or USU administration was terminated for their failings to properly or adequately investigate or process reports of sexual misconduct, or for their failings to properly or adequately administer USU's Title IX policies.

229.    In addition, on information and belief, no one from the Office of Equity or USU administration has been subjected to public humiliation and disparagement by USU athletic director, Diana Sabau, and USU president, Elizabeth Cantwell, who is ultimately responsible for the supervision and accountability of the Office of Equity.

230.    Indeed, USU has singled out the person who was responsible for timely and appropriately submitting the IR—Mr. Bovee—for termination and public degradation.

I.      **Mr. Bovee's Formal Grievance Hearing and Committee Recommendations.**

231.    On August 1, 2024, Mr. Bovee filed a formal grievance with USU, pursuant to USU Policy 399.5 and Policy 325, to contest his termination of employment.

232.    Specifically, his grievance centered on: (1) whether USU's termination of his employment was retaliatory and violated Policies 321, 325, and 305 when it terminated him after he filed complaints regarding the abusive and hostile treatment of his supervisor, Sabau, and after he timely and properly filed a Title IX IR reporting sexual misconduct; and (2) whether USU violated Policy 399 or Policy 311 when it terminated his employment without first providing him the opportunity to improve his performance, when it failed to follow its own progressive discipline policy—which provides steps for verbal and written warnings prior to termination—and when it failed to offer him the opportunity to resign in lieu of termination. Then, it proceeded to publicly announce his termination, misrepresent the facts surrounding his termination, and smear his reputation in the media and in the community.

233.    USU assembled a Grievance Committee, made up of three USU employees, and held a two-day hearing on September 16 and 17, 2024 to adjudicate Mr. Bovee's claims (the "Hearing").

234.    Prior to the Hearing, USU informed Mr. Bovee that it would exclude all evidence and argument related to Mr. Bovee's claims of retaliation and violations of Policies 321 and 305. Instead, the Committee was instructed by USU and the Utah State Office of the Attorney General to only consider evidence and argument related to whether Mr. Bovee's termination violated Policies 399 or 311.

235.    The Committee issued its written Recommendation on September 24, 2024.

236.    Mr. Bovee, however, was not provided a copy of the Recommendation until almost a full week later, on September 30, 2024.

237.    In its Recommendation, the Committee specifically stated that ██████████ █████████████████████████████████████████████████ █████████████████████████████████████████████████████████ ████████████████████████████████ Grievance Hearing Committee Recommendation at pg. 6, attached hereto as Exhibit "30."

238.    The Committee also found that the Husch Blackwell Report was ████████ █████████ *Id.* at pg. 6.

239.    The Committee ████████████████████████████████████ ███████████████ *Id.* at pg. 7.

240.    Moreover, the Committee stated: ████████████████████ █████████████████████████████████████████████████████ █████████████████████████████████████████████████████ █████████████████████████████████████████████████████ ███████████████████████████████████████████████████t █████████████████████████████████ *Id.* at pg. 7 (emphasis in original).

241.    Despite these findings that directly contradict USU's position and public statements with regard to the purported "severe misconduct" underlying Mr. Bovee's termination, the Committee concluded █████████████████████████████ █████████████████████████████████████████████████████ █████████████████████████

242.    The Grievance Committee's Recommendation found specifically that the

language of USU Policy 

*Id.*

at pg. 5 (emphasis in original).

243.    Essentially, the Committee members determined that

244.    Even with that impossible standard, the Committee was not unanimous in its

decision of whether USU's policies had been followed with respect to Mr. Bovee's termination.

245.    As to Mr. Bovee's claims regarding USU's requirement to allow him the

opportunity to resign in lieu of termination, the Committee failed to address that point in its

Recommendation.

246.    In Mr. Bovee's case, he was given a Termination Letter and was never afforded

the opportunity to resign—or to even discuss or question the alleged bases of his termination—

before USU publicly announced his termination, misrepresented the facts surrounding his

termination, and smeared his reputation in the media, all consistent with Sabau's original plan.

**<u>FIRST CAUSE OF ACTION</u>**
**(Retaliation under Title IX, 20 U.S.C. § 1681, 34 C.F.R. § 106.71—Against USU)**

247.    Plaintiff adopts and fully incorporates the preceding allegations as if they were set

forth herein.

248.    Plaintiff participated in a protected activity under federal law when he, along with

two other Reporting Employees, filed the IR with the Office of Equity on April 12, 2023,

40

reporting all information known to him related to the Student Athlete's alleged sexual misconduct pursuant to Title IX and Utah State University Interim Policy 340.

249.    USU subjected Plaintiff to adverse employment actions by terminating his employment on July 2, 2024 and by subjecting him to differential treatment.

250.    Upon information and belief, no other USU employee has ever been terminated from USU for reporting a Title IX violation, or for alleged incomplete reporting pursuant to Title IX and Utah State University policies.

251.    Numerous employees in the Office of Equity and Office of Legal Affairs at USU failed to adequately or properly address the IR filed by Plaintiff, which resulted in USU failing to ever perform the legally mandated Title IX investigation into the Student Athlete's alleged sexual misconduct.

252.    Rather than address the failings of the Office of Equity and Office of Legal Affairs employees or discipline the employees that failed to meet their statutory obligations, USU terminated the employment of the very employees who did meet their obligations under Title IX and Utah State University Interim Policy 340 to timely and properly file the required IR.

253.    USU's adverse actions against Plaintiff were in direct response to Plaintiff's protected activity.

254.    Plaintiff has suffered damages as a result of the aforementioned Defendant's actions.

## <u>SECOND CAUSE OF ACTION</u>
### (Defamation—Against USU, Cantwell, and Sabau)

255.    Plaintiff adopts and fully incorporates the preceding allegations as if they were set forth herein.

41

256.    Shortly after Plaintiff's employment was summarily terminated from USU, USU, Cantwell, and Sabau proactively made public statements in the media and on USU website regarding Plaintiff's termination.

257.    Their statements claimed that Plaintiff was terminated for violations of USU policy related to sexual misconduct.

258.    These statements were false and constitute defamation and defamation *per se*.

259.    These statements about Mr. Bovee were not subject to any privilege and were recklessly, falsely, maliciously, and intentionally published by USU, Cantwell, and Sabau.

260.    USU, Cantwell, and Sabau intentionally published these statements with actual malice and with the intent to harm Plaintiff.

261.    The numerous statements made by USU, Cantwell, and Sabau have adversely affected Plaintiff's reputation and he has been damaged by their publication.

262.    USU, Cantwell, and Sabau knew that their statements would cause injury to Plaintiff.

263.    USU, acting through its president, is further exposed to liability vicariously.

264.    USU, Cantwell, and Sabau abused any privileges that may otherwise be available as a government entity and government employees because they acted with willful misconduct when they defamed Plaintiff.

265.    Plaintiff has suffered damages as a result of the aforenamed Defendants' actions.

### THIRD CAUSE OF ACTION
**(False Light—Against USU, Cantwell, and Sabau)**

266.    Plaintiff adopts and fully incorporates the preceding allegations as if they were set forth herein.

42

267.     USU, Cantwell, and Sabau proactively gave publicity to matters concerning Plaintiff that has placed Plaintiff before the public in a false light when they publicly announced his termination of employment, misrepresented the facts surrounding his termination, and smeared his reputation in the media.

268.     The false light in which Plaintiff has been placed would be highly offensive to a reasonable person.

269.     USU, Cantwell, and Sabau had knowledge of, or acted in reckless disregard as to, the falsity of the publicized matters and the false light in which Plaintiff would be placed.

270.     USU, Cantwell, and Sabau intentionally published these statements placing Plaintiff in a false light with actual malice and with the intent to harm Plaintiff.

271.     USU, Cantwell, and Sabau knew that their statements would cause injury to Plaintiff.

272.     USU, acting through its president, is further exposed to liability vicariously.

273.     USU, Cantwell, and Sabau abused any privileges that may otherwise be available as government entity and government employees because they acted with willful misconduct when they published statements placing Plaintiff in a false light.

274.     Plaintiff has suffered damages as a result of the aforenamed Defendants' actions.

### FOURTH CAUSE OF ACTION
**(Breach of Contract—Against USU)**

275.     Plaintiff adopts and fully incorporates the preceding allegations as if they were set forth herein.

276.     A public employee can assert an implied in fact contract claim where an employee policy manual places an express obligation on the employer.

43

277.    USU articulated the following policies to its employees, including Mr. Bovee, and made each readily available to Mr. Bovee.

278.    USU breached contracts with Mr. Bovee by failing to properly follow the below policies regarding Mr. Bovee's termination of employment.

279.    University Policy 321 mandates that all USU employees must avoid behaving disrespectfully, including bullying, or any other behavior that would reasonably offend, intimidate, embarrass, or humiliate others, whether deliberately or unintentionally.

280.    Section 2 states that university-related interactions "should be conducted with courtesy, civility, decency, and a concern for personal dignity. Disrespectful behavior and/or abusive conduct will not be tolerated." Further, "[a]ll employees violating this policy are subject to disciplinary action up to and including termination of employment."

281.    University Policy 321.2.1 encourages employees to report abusive conduct by another employee, using the grievance procedures set forth in "USU Policy 325: Employment Grievance Procedures."

282.    University Policy 325.2.2 prohibits any action against employees where the primary purpose is to discourage the employee from filing formal grievances and prohibits any adverse, retaliatory action against an employee for filing grievances, such as Mr. Bovee's complaints with HR to report abusive conduct by Sabau.

283.    Interim University Policy 305.1 prohibits retaliation as defined by § 305.5 of the policy. Section 305.5 defines retaliation as: "Taking adverse action, including any action that might deter a reasonable person from engaging in protected activity, because the individual has made a report or complaint, testified, assisted, participated, or refused to participate in any manner in an investigation, formal or informal proceeding, or other procedure under policies

44

340, 339, 339A, or 305. A causal relationship between an adverse action and good faith reporting or participation under this Policy is needed to demonstrate that retaliation has occurred."

284.    University Policy 399 states that "Whenever possible, employees should be counseled and given an opportunity to improve their performance before dismissal is warranted (refer to Policy 311 Corrective Action). All dismissals require prior consultation with the department head/director and the Office of Human Resources."

285.    University Policy 311, § 2.4, titled "Resignation in Lieu of Disciplinary Action or Termination states that rather than face corrective or disciplinary action, USU must allow an employee to voluntarily resign. University Policy 311 also provides a progressive discipline policy to be followed including moving from verbal to written to a final action, including termination.

286.    USU breached its contract with Mr. Bovee by:

   a.  violating Policies 321 and 325 when it retaliated against Mr. Bovee by decreasing his salary and terminating his employment after he complained regarding the abusive and hostile treatment of his supervisor, Sabau;

   b.  violating Policy 305 when it retaliated against Mr. Bovee by terminating his employment after he timely and properly filed a Title IX IR reporting sexual misconduct; and

   c.  violating Policy 399 and Policy 311 when it terminated Mr. Bovee's employment without first providing him notice and the opportunity to improve his performance, when it failed to follow its own progressive discipline policy—which provides steps for verbal and written warnings prior to termination, and when it failed to offer him the opportunity to resign in lieu of

45

termination prior to publicly announcing his termination and misrepresenting the facts surrounding his termination and smearing his reputation in the media.

287.  Plaintiff has suffered damages as a result of USU's breaches of contract.

### FIFTH CAUSE OF ACTION
**(Tortious Interference with Existing Economic Relations—Against Sabau, Cantwell, and McKinney)**

288.   Plaintiff adopts and fully incorporates the preceding allegations as if they were set forth herein.

289.   Sabau, Cantwell, and McKinney intentionally and tortiously interfered with Plaintiff's existing economic relations for an improper purpose and by improper means.

290.   Sabau, Cantwell, and McKinney intentionally retaliated against Plaintiff by decreasing his salary and terminating his employment, sabotaging his existing economic relationship with USU.

291.   Sabau, Cantwell, and McKinney intentionally improperly terminated Plaintiff's employment and failed to offer him the opportunity to resign in lieu of termination prior to publicly announcing his termination, misrepresenting the facts surrounding his termination, and smearing his reputation in the media, in the local community, and in the athletic community.

292.   These actions have frustrated and stymied Plaintiff's ability to fulfill his employment obligations to USU.

293.   Sabau, Cantwell, and McKinney knew that these actions would result in injuries to Plaintiff.

294.   Further, upon information and belief, Sabau, Cantwell, and McKinney were acting for purely personal reasons.

46

295.     Sabau's, Cantwell's, and McKinney's efforts to retaliate against and terminate the employment of Mr. Bovee were not in the best interest of USU and were not connected to USU's interests.

296.     Cantwell, McKinney, and Sabau abused any privileges that may otherwise be available as government employees because they acted with willful misconduct when they engaged in the conduct described above.

297.     Plaintiff has suffered damages as a result of Cantwell's, Sabau's, and McKinney's tortious interference with existing economic relations.

## SIXTH CAUSE OF ACTION
**(Tortious Interference with Prospective Economic Relations—Against USU, Sabau, Cantwell, and McKinney)**

298.     Plaintiff adopts and fully incorporates the preceding allegations as if they were set forth herein.

299.     USU, Sabau, Cantwell, and McKinney intentionally and tortiously interfered with Plaintiff's prospective economic relations for an improper purpose and by improper means.

300.     USU, Sabau, Cantwell, and McKinney intentionally improperly terminated Plaintiff's employment and failed to offer him the opportunity to resign in lieu of termination prior to publicly announcing his termination, misrepresenting the facts surrounding his termination, and smearing his reputation in the media, in the local community, and in the athletic community.

301.     These actions sabotaged Mr. Bovee's other potential economic relationships with other prospective employers and institutions.

302.     These actions have frustrated and stymied Plaintiff's ability to find alternative employment in his industry and have made seeking other employment with prospective employers in the industry virtually impossible.

303.    USU, Sabau, Cantwell, and McKinney knew that these actions would result in injuries to Plaintiff.

304.    Further, upon information and belief, Sabau, Cantwell, and McKinney were acting for purely personal reasons.

305.    USU, acting through its president, is further exposed to liability vicariously.

306.    Sabau's, Cantwell's, and McKinney's efforts to retaliate against and terminate the employment of Mr. Bovee were not in the best interest of USU and were not connected to USU's interests.

307.    USU, Cantwell, Sabau, and McKinney abused any privileges that may otherwise be available as government entity and government employees because they acted with willful misconduct when they engaged in the conduct described above.

308.    Plaintiff has suffered damages as a result of USU's, Cantwell's, Sabau's, and McKinney's tortious interference with prospective economic relations.

### SEVENTH CAUSE OF ACTION
**(Deprivation of Mr. Bovee's Property Interest without Due Process in Violation of 42 U.S.C. § 1983—Against USU)**

309.    Plaintiff adopts and fully incorporates the preceding allegations as if they were set forth herein.

310.    As a staff employee, Mr. Bovee had a property interest in his employment and a reasonable expectation that his employment would continue and could only be terminated "for cause."

311.    According to USU Policies and the Committee Recommendation, Mr. Bovee should have been afforded due process rights and was entitled to a fair and adequate grievance process to determine whether USU's termination of his employment was valid.

48

312.    USU's unlawful termination of Mr. Bovee with no notice and no opportunity to receive counsel and improve his performance, and USU's subsequent grievance process, which was arbitrary and capricious in that it prohibited the grievance Committee from making any findings that USU's termination was indeed not valid, violated his right to procedural and substantive due process of law under the United States Constitution.

313.    USU's conduct violated Mr. Bovee's Fourteenth Amendment rights by depriving him of a property interest without due process.

314.    As a result of USU's actions, Mr. Bovee has suffered and will continue to suffer both economic and non-economic losses. Mr. Bovee is entitled to injunctive relief, pursuant to 42 U.S.C. § 1983, *et seq.*, including, but not limited to: back pay and lost benefits, front pay; reinstatement to his prior position at USU, and attorneys' fees and costs.

## EIGHTH CAUSE OF ACTION
**(Deprivation of Mr. Bovee's Property Interest without Due Process in Violation of Article I, Section 7 of the Utah Constitution–Against USU)**

315.    Plaintiff adopts and fully incorporates the preceding allegations as if they were set forth herein.

316.    As a staff employee, Mr. Bovee had a property interest in his employment and a reasonable expectation that his employment would continue and could only be terminated "for cause."

317.    According to USU Policies and the Committee Recommendation, Mr. Bovee should have been afforded due process rights and was entitled to a fair and adequate grievance process to determine whether USU's termination of his employment was valid.

318.    USU's unlawful termination of Mr. Bovee, with no notice and no opportunity to receive counsel and improve his performance, and USU's subsequent grievance process, which

was arbitrary and capricious in that it prohibited the grievance Committee from making any findings that USU's termination was indeed not valid, violated his right to procedural and substantive due process of law under the Utah Constitution.

319.    USU's conduct violated Article I, Section 7, of the Utah Constitution by depriving Mr. Bovee of a property interest without due process.

320.    As a result of USU's actions, Mr. Bovee has suffered and will continue to suffer both economic and non-economic losses. Mr. Bovee is entitled to damages including, but not limited to, lost wages, the value of lost benefits, future pecuniary losses, emotional distress, damage to his reputation, other compensatory damages, injunctive relief including reinstatement to his prior position at USU, and consequential damages, including attorneys' fees and costs.

### NINTH CAUSE OF ACTION
**(Deprivation of Mr. Bovee's Liberty Interest without Due Process in Violation of 42 U.S.C. § 1983—Against USU)**

321.    Plaintiff adopts and fully incorporates the preceding allegations as if they were set forth herein.

322.    As a staff employee, Mr. Bovee had a property interest in his employment and a reasonable expectation that his employment would continue and could only be terminated "for cause."

323.    Mr. Bovee also had a liberty interest in his good name and reputation as it affected his property interest.

324.    USU infringed upon this liberty interest by impugning the good name, reputation, honor, and integrity of Mr. Bovee by wrongfully terminating his employment based on false allegations of policy violations and unsatisfactory job performance.

325.    USU proactively made public the allegations of Mr. Bovee's purported policy violations and alleged unsatisfactory job performance through false and misleading statements to

50

the media and further have included such as part of Mr. Bovee's personnel file, whereby these false allegations impose a stigma on his professional reputation.

326.     USU's words and actions stigmatized him, the stigmatization affected a tangible employment interest, and the words were untrue.

327.     As a result of USU's wrongful conduct, Mr. Bovee's professional reputation has been adversely impacted insofar as it has foreclosed other business and employment opportunities that were otherwise presently available to Mr. Bovee.

328.     As a further result of USU's actions, Mr. Bovee has suffered and will continue to suffer both economic and non-economic losses. Mr. Bovee is entitled to injunctive relief, pursuant to 42 U.S.C. § 1983, *et seq*., including, but not limited to: back pay and lost benefits, front pay, reinstatement to his prior position at USU, and attorneys' fees and costs.

**TENTH CAUSE OF ACTION**
**(Deprivation of Mr. Bovee's Liberty Interest without Due Process in Violation of Article I, Section 7 of the Utah Constitution–Against USU)**

329.     Plaintiff adopts and fully incorporates the preceding allegations as if they were set forth herein.

330.     As a staff employee, Mr. Bovee had a property interest in his employment and a reasonable expectation that his employment would continue and could only be terminated "for cause."

331.     Mr. Bovee also had a liberty interest in his good name and reputation as it affected his property interest.

332.     USU infringed upon this liberty interest by impugning the good name, reputation, honor, and integrity of Mr. Bovee by wrongfully terminating his employment based on false allegations of policy violations and unsatisfactory job performance.

51

333.    USU made public the allegations of Mr. Bovee's purported policy violations and unsatisfactory job performance through false and misleading statements to the media and further have included such as part of Mr. Bovee's personnel file, whereby these false allegations impose a stigma on his professional reputation.

334.    As a result of USU's wrongful conduct, Mr. Bovee's professional reputation has been adversely impacted insofar as it has foreclosed other business and employment opportunities that were otherwise presently available to Mr. Bovee.

335.    USU's words and actions stigmatized him, the stigmatization affected a tangible employment interest, and the words were untrue.

336.    As a further result of USU's actions, Mr. Bovee has suffered and will continue to suffer both economic and non-economic losses. Mr. Bovee is entitled to damages including but not limited to lost wages, the value of lost benefits, future pecuniary losses, emotional distress, damage to his reputation, other compensatory damages, injunctive relief including reinstatement to his prior position at USU, and consequential damages, including attorneys' fees and costs.

## ELEVENTH CAUSE OF ACTION
**(In the Alternative: Declaratory Relief – the Utah Governmental Immunity Act, § 63G-7-101 *et seq.*, Is Unconstitutional as Applied to Bar the Second, Third, Fifth, and Sixth Causes of Action under Article I, Section 11 of the Utah Constitution)**

337.    Plaintiff adopts and fully incorporates the preceding allegations as if they were set forth herein.

338.    Article I, Section 11 of the Utah Constitution (the "Open Courts Clause") provides:

> All courts shall be open, and every person, for an injury done to the person in his or her person, property, or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay; and no person shall be barred from prosecuting or defending before any tribunal in this State, with or

52

without counsel, any civil cause to which the person is a party.
Utah Const. art. I, § 11.

339.    Pursuant to Utah Code § 78B-6-403(3) and Utah Rule of Civil Procedure

24(d)(1), Plaintiff has provided Notice to the Attorney General of this constitutional challenge to

the UGIA and has followed all necessary procedural steps required by statute.

a.    *UGIA Is Unconstitutional as Applied to Bar Plaintiff's Defamation Claim.*

340.    As more particularly described above, USU, Cantwell, and Sabau intentionally

published false and misleading statements about Plaintiff to the media with actual malice, the

intent to harm him, and knowledge that their statements would cause injury to Plaintiff.

341.    The statements were false and constitute defamation and defamation *per se*.

342.    The defamatory statements made by USU, Cantwell, and Sabau have adversely

affected Plaintiff's reputation and he has been damaged by their publication.

343.    Public statements to the media made by USU, Cantwell, and Sabau — let alone

maliciously defamatory public statements made to the media — are not essential to the core

governmental activity of operating a public university, nor is a media campaign of such a unique

nature that it can only be performed by the government alone.

344.    Imposing liability on USU, Cantwell, and Sabau for their maliciously defamatory

public statements made to the media would not thwart any core governmental activity promoting

public safety and welfare.

345.    An expansive reading of the Utah Governmental Immunity Act, Utah Code §

63G-7-101 *et seq.*, ("UGIA") that bars Plaintiff's claims against USU, Cantwell, and Sabau for

their maliciously defamatory public statements would be an unconstitutional infringement upon

Plaintiff's right to seek redress for injuries to his person and his reputation as guaranteed by the

Open Courts Clause.

346.    If the UGIA serves to bar claims against USU, Cantwell, and Sabau for their maliciously defamatory public statements, then the UGIA abrogates a cause of action that existed at the time of its enactment, and Plaintiff has no effective and reasonable alternative remedy under the law.

b.    _UGIA Is Unconstitutional as Applied to Bar Plaintiff's False Light Claim._

347.    As more particularly described above, USU, Cantwell, and Sabau intentionally, and with knowledge that their statements would injure Plaintiff, published statements announcing Plaintiff's termination of employment that painted Plaintiff in a false light by misrepresenting facts and smearing his reputation in the media.

348.    USU, Cantwell, and Sabau had knowledge of, or acted in reckless disregard as to, the falsity of the publicized matters and the false light in which Plaintiff would be placed.

349.    Plaintiff has suffered damages to his person and reputation as a result of USU's, Cantwell's, and Sabau's malicious and intentional conduct painting him in a false light.

350.    Public statements to the media made by USU, Cantwell, and Sabau — let alone public statements to the media maliciously painting Plaintiff in a false light — are not essential to the core governmental activity of operating a public university, nor is a media campaign of such a unique nature that it can only be performed by the government alone.

351.    Imposing liability on USU, Cantwell, and Sabau for their public statements made to the media maliciously casting Plaintiff in a false light would not thwart any core governmental activity promoting public safety and welfare.

352.    An expansive reading of UGIA that bars Plaintiff's claims against USU, Cantwell, and Sabau for their public statements maliciously painting Plaintiff in a false light would be an unconstitutional infringement upon Plaintiff's right to seek redress for injuries to his person and his reputation as guaranteed by the Open Courts Clause.

54

353.    If the UGIA serves to bar claims against USU, Cantwell, and Sabau for their public statements maliciously painting Plaintiff in a false light, then the UGIA abrogates a cause of action that existed at the time of its enactment, and Plaintiff has no effective and reasonable alternative remedy under the law.

  c. *UGIA Is Unconstitutional as Applied to Bar Plaintiff's Tortious Interference with Existing Economic Relations Claim.*

354.    As more particularly described above, Sabau, Cantwell, and McKinney intentionally, tortiously, and with knowledge that their actions would injure Plaintiff, interfered with Plaintiff's existing economic relations for an improper purpose and by improper means by retaliatorily decreasing his salary, terminating his employment, and, contrary to USU policy, refusing to offer him the opportunity to resign in lieu of termination

355.    Sabau's, Cantwell's, and McKinney's actions have injured Plaintiff by frustrating his ability to fulfill his employment obligations to USU.

356.    Intentionally tortious conduct that wrongfully and improperly interferes with an individual's existing economic relations cannot be considered essential to the core governmental activity of operating a public university, especially if such conduct itself is contrary to the public university's own policies.

357.    Imposing liability on Sabau, Cantwell, and McKinney for their intentionally tortious conduct sabotaging Plaintiff's existing economic relations — especially when such intentionally tortious conduct violates USU's own policies — would not thwart any core governmental activity promoting public safety and welfare.

358.    An expansive reading of the UGIA that bars Plaintiff's claims against Sabau, Cantwell, and McKinney for their tortious conduct sabotaging Plaintiff's existing economic

4913-4332-5719, v. 6

relations would be an unconstitutional infringement upon Plaintiff's right to seek redress for injuries to his person and his reputation as guaranteed by the Open Courts Clause.

359.    If the UGIA serves to bar claims against Sabau, Cantwell, and McKinney for their intentionally tortious conduct sabotaging Plaintiff's existing economic relations, then the UGIA abrogates a cause of action that existed at the time of its enactment, and Plaintiff has no effective and reasonable alternative remedy under the law.

        d.    _UGIA Is Unconstitutional as Applied to Bar Plaintiff's Tortious Interference with Prospective Economic Relations Claim._

360.    As more particularly described above, USU, Sabau, Cantwell, and McKinney intentionally, tortiously, and with knowledge that their actions would injure Plaintiff, interfered with Plaintiff's prospective economic relations for an improper purpose and by improper means by retaliatorily decreasing his salary, terminating his employment, and failing to offer him the opportunity to resign in lieu of termination prior to publicly announcing his termination, and thereafter misrepresenting the facts surrounding his termination and smearing his reputation in the media, in the local community, and in the athletic community.

361.    USU, Sabau, Cantwell, and McKinney sabotaged Plaintiff's other potential economic relationships with other prospective employers and institutions.

362.    USU's, Sabau's, Cantwell's, and McKinney's actions have injured Plaintiff by frustrating and stymying his ability to find alternative employment in his industry and have made seeking other employment with prospective employers in the industry virtually impossible.

363.    Intentionally tortious conduct that wrongfully and improperly interferes with an individual's prospective economic relations cannot be considered essential to the core

governmental activity of operating a public university, especially if such conduct itself is contrary to the public university's own policies.

364.    Imposing liability on USU, Sabau, Cantwell, and McKinney for their intentionally tortious conduct sabotaging Plaintiff's prospective economic relations — especially when such tortious conduct violates USU's own policies — would not thwart any core governmental activity promoting public safety and welfare.

365.    An expansive reading of the UGIA that bars Plaintiff's claims against USU, Sabau, Cantwell, and McKinney for their intentionally tortious conduct sabotaging Plaintiff's existing economic relations would be an unconstitutional infringement upon Plaintiff's right to seek redress for injuries to his person and his reputation as guaranteed by the Open Courts Clause.

366.    If the UGIA serves to bar claims against USU, Sabau, Cantwell, and McKinney for their tortious conduct sabotaging Plaintiff's prospective economic relations, then the UGIA abrogates a cause of action that existed at the time of its enactment, and Plaintiff has no effective and reasonable alternative remedy under the law.

367.    Accordingly, Plaintiff seeks a declaratory judgment from this Court that the UGIA as applied to bar the Second, Third, Fifth, and/or Sixth Causes of Action is unconstitutional under Article I, Section 11 of the Utah Constitution.

## **DEMAND FOR JURY TRIAL**

Plaintiff requests that this matter be tried before a jury.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment against Defendants, jointly and severally, as follows:

A.     For judgment on all claims and causes of action against Defendants;

B.     For an award of all economic and non-economic damages caused by Defendants' conduct, including compensatory damages, in an amount to be determined at trial, damages for emotional distress, pain and suffering, humiliation, and as applicable, plus interest, in an amount to be determined at trial;

C.     For an award of punitive damages in an amount to be determined at trial;

D.     For an award of pre-judgment and post-judgment interest as allowed by law, as applicable;

E.     For an award of all of Plaintiffs' attorneys' fees and costs of suit, including all costs and expenses incurred through the collection of judgment;

F.     For an award of equitable relief in an amount to be determined at trial; and

G.     For an award of any other legal or equitable relief as the court deems just and proper.

DATED:  February 11, 2025.


**COHNE KINGHORN, P.C.**

/s/ Lisa R. Petersen
Lisa R. Petersen
Brenda E. Weinberg
Amy L. Herrington
*Attorneys for Plaintiffs*

4913-4332-5719, v. 6

## <u>VERIFICATION</u>

I, Jerry Bovee, hereby declare, certify, verify and/or state, under criminal penalty of the State of Utah and pursuant to Utah Code § 78B-18a-101, *et seq.,* that I have read the foregoing instrument and know the contents thereof to be true except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

DATED this 11th day of February 2025.


   /s/ Jerry Bovee (*with permission*)      
Jerry Bovee