# EXHIBIT 10

**U.S. Department of Justice**



*Civil Rights Division*
*Educational Opportunities Section*

*United States Attorney's Office*
*District of Utah*

---

DJ 169-77-25  SS:FM:VL:AD
USAO 201700003

U.S. Mail:    Civil Rights Division
              Educational Opportunities Section
              950 Pennsylvania Ave., N.W.
              4CON – 10th Floor
              Washington, D.C. 20530

FedEx/UPS:    Educational Opportunities Section
              Civil Rights Division
              4 Constitution Square
              150 M Street NE
              Washington, D.C. 20002

October 2, 2019

**BY ELECTRONIC AND FIRST CLASS MAIL**

President Noelle Cockett
President's Office
Utah State University
1400 Old Main Hill
Logan, Utah 84322-1400

Re:    Title IX Investigation of Utah State University

Dear President Cockett:

The U.S. Department of Justice (the "Department"), through its Civil Rights Division and the United States Attorney's Office for the District of Utah, has completed its investigation of the policies and practices of Utah State University (the "University" or "USU") for responding to reports of student-on-student and employee-on-student sexual harassment, including sexual assault. The investigation principally covered the period from January 1, 2013 until October 1, 2017 (the "Relevant Period"). The Department conducted the investigation under Title IX of the Education Amendments of 1972 ("Title IX") as amended, 20 U.S.C. §§ 1681–1688, and its implementing regulations, 28 C.F.R. pt. 54, which prohibit sex discrimination by recipients of federal financial assistance. USU is a recipient of financial assistance from the Department.

This letter constitutes notice of the Department's conclusions and of the minimum steps necessary, in our view, to bring the University's policies, practices, and procedures into compliance with federal law and to remedy past violations. In summary, the Department's investigation revealed that during the Relevant Period USU did not comply with Title IX and its

implementing regulations in key respects, including by failing to investigate and resolve sexual harassment of which it had notice, often leaving the complainant, and the larger community, vulnerable to sexual harassment.  As a result, severe sexual harassment, including rapes and other forcible sexual assaults, went unaddressed and students who were subjected to sexual harassment often suffered negative academic, mental health, and social consequences, including withdrawal from their classes or from the University altogether.

The Department looks forward to discussing possible remedial measures with the University, in a timely fashion, to ensure that the University can commence necessary corrective action at the earliest possible time.  The Department appreciates the University's ongoing cooperation and commitment to address sexual harassment, and the numerous actions the University has taken to address areas of non-compliance with Title IX.  The Department thanks the University's leadership and each member of the USU and greater Cache Valley and Utah communities who provided relevant information to the Department, especially the current and former students who shared their personal experiences.

## BACKGROUND

USU is a large, public research university.  Its main campus is in Logan, which was the principal focus of the Department's investigation.[1]  USU also has regional campuses in Brigham City, Tooele, Uintah Basin, Price, and Blanding, and educational centers across the state.  In fall 2018, the University had an overall student enrollment of almost 28,000, including almost 25,000 undergraduates.  The Logan campus had an undergraduate enrollment of about 16,000, and employed approximately 800 faculty members.  The University offers 16 varsity NCAA Division 1-A sports, has eight sororities and fraternities, and is home to over 200 student-run clubs and organizations.

The Affirmative Action/Equal Opportunity Office ("AAEO") is responsible for addressing sexual harassment and other discrimination issues involving members of the USU community.  During the Relevant Period, the AAEO Director served as USU's Title IX Coordinator.[2]  At that time, the AAEO Office had a staff ranging from three to four employees.

During the Relevant Period, the University had seven Deputy Title IX coordinators who work within different components of USU.  They included two senior administrators in the Student Conduct Office, the Director of Housing and Residence Life, the Senior Associate Director of Human Resources, the Chair of the Diversity Council and Bias Response Team, an Assistant Athletic Director, and an administrator at USU's Price campus.  To a significant extent, these Deputy Coordinators worked independently of the Title IX Coordinator.

USU's Sexual Assault and Anti-Violence Information Office ("SAAVI") provides information, confidential counseling, and advocacy to the USU community.  Because SAAVI provides confidential services, USU policies exempted SAAVI employees and other mental

---

[1] In some instances, the Department reviewed complaints and practices outside of the Relevant Period or involving another University campus.

[2] Hereafter, this letter refers to the AAEO Office as the "Title IX Office" and uses the term "Title IX Coordinator" instead of "AAEO Director."

REDACTED--FERPA PROTECTED INFORMATION

health counselors from reporting obligations. Thus, a report of sexual harassment to SAAVI would not automatically trigger an investigation by the University, regardless of whether it came from a student or an employee with knowledge of harassment.

## THE DEPARTMENT'S INVESTIGATION

On January 12, 2017, the Department notified the University that it was initiating an investigation into the University's responses to reports of student-on-student and employee-on-student sexual harassment, including sexual assault. During the investigation, the Department reviewed thousands of pages of University documents. These included approximately 240 sexual harassment incident files and additional evidence corroborating dozens of the underlying reports; policies on sexual harassment, sexual assault, and sex discrimination; documents related to the University's Title IX investigation and grievance procedures; the University's student misconduct grievance procedures; USU's student-athlete code of conduct and athletic teams' rules; housing policies; campus climate survey results; Clery reports; reports relating to the University's Sexual Violence Task Force; and Title IX training materials.

The Department spoke to a broad cross-section of University constituents and conducted a comprehensive examination of the University's efforts to respond to and prevent the recurrence of sexual harassment and retaliation. The Department made four site visits to USU, conducting approximately 60 in-person interviews with University officials, faculty, staff, and students, plus additional interviews with community members. The Department held numerous open office hours at USU for current and former students, including both complainants and respondents, and provided students and alumni the opportunity to contact the Department to provide information pertinent to its investigation.

## LEGAL AUTHORITIES

Title IX and its implementing regulations prohibit discrimination on the basis of sex in education programs and activities operated by recipients of federal financial assistance. The statute grants the Department, among other federal agencies, the authority to take administrative action to effectuate Title IX's nondiscrimination mandate. 20 U.S.C. § 1682. The regulations are aimed at preventing and addressing sex discrimination. Recipients of federal financial assistance agree to comply with these regulations as a condition of receiving funding.

I.    **Application of Title IX's Nondiscrimination Mandate to Sexual Harassment**

Sexual harassment is a form of sex discrimination covered by Title IX. *See Davis v. Monroe Cty. Bd. Of Educ.*, 526 U.S. 629, 649-50 (1999); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998); *Franklin v. Gwinnett Cty. Pub. Sch.,* 503 U.S. 60, 74-74 (1992). Sexual harassment can include unwelcome sexual advances, requests for sexual favors, and other unwelcome verbal, nonverbal, or physical conduct of a sexual nature. Sexual assault is an extreme form of sexual harassment. The Supreme Court has held in private damages litigation that sexual harassment creates a hostile educational environment when it "is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *See Davis*, 526 U.S. at 650. Sexual harassment may create a hostile educational environment for a single individual or for a group of

3

students in the same class, program, or larger unit. *See Davis*, 526 U.S. at 653 (holding school district liable for harassment of a single individual and acknowledging possible liability for failing to respond "to severe, gender-based mistreatment played out on a 'widespread level' among students").

A school violates Title IX when it has notice of sexual harassment that creates a hostile educational environment "and fails adequately to respond." *Gebser*, 524 U.S. at 290; *see also Davis*, 526 U.S. at 646-47. A school has notice of sexual harassment when an official of the school "with authority to take corrective action to end the discrimination" has actual notice of the sexual harassment. *Gebser*, 524 U.S. at 290. When an official "who is advised of a Title IX violation refuses to take action to bring the [funding] recipient into compliance," the inaction "is an official decision by the recipient not to remedy the violation." *Id*. A failure to investigate conduct that constitutes sexual harassment constitutes an ineffective response under Title IX, particularly when the sexual harassment persists. *See Davis*, 526 U.S. at 654 (permitting a Title IX claim to move forward on allegations that the school district "made no effort whatsoever either to investigate or to put an end to the harassment").

No particular response to sexual harassment is required; however, a university is in violation of Title IX if it does not respond reasonably in light of known circumstances. *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000). A university has many options to address harassment. It may, for example, discipline the responsible party, provide mental health services, provide academic accommodations or supports, implement a no-contact order, adjust housing assignments or class schedules, implement campus safety measures, or implement educational training on preventing and responding to sexual harassment and assault.

Even if a school reasonably attempts to address the hostile environment, if it learns that its response has failed to do so, the school may be in violation of Title IX if "it continues to use those same methods to no avail." *Vance*, 231 F.3d at 261. A university may violate Title IX when its inadequate response causes students "to be 'vulnerable to' further harassment'" even if there is no "allegation of subsequent actual sexual harassment." *Farmer v. Kansas State Univ.*, 918 F.3d 1094, 1104 (10th Cir. 2019). A university also may be in violation of Title IX if it is deliberately indifferent to providing adequate sexual harassment training or guidance "that is obviously necessary" in light of known circumstances. *Simpson v. Univ. of Colo. Boulder,* 500 F.3d 1170, 1178 (10th Cir. 2007).

## II.    The Department's Title IX Procedural Requirements

The Department's Title IX regulations contain three procedural requirements designed to help schools respond to sexual harassment and prevent its recurrence. First, the regulations require that a school designate at least one employee to coordinate its Title IX compliance, including investigation of reports the school receives alleging sexual harassment. 28 C.F.R. § 54.135(a). The school must notify students and employees of the name, office address, and telephone number of the Title IX Coordinator. *Id*.

Second, the school must notify all students, employees, and applicants for admission and employment that it does not discriminate on the basis of sex. The notice must state that inquiries concerning Title IX or the Title IX regulations may be referred to the Title IX Coordinator. 28

4

C.F.R. § 54.140(a)(1). The school must include the notice of nondiscrimination in all announcements, bulletins, catalogs, and application forms available to students, employees, and applicants and in all documents used in connection with the recruitment of students or employees. 28 C.F.R. § 54.140(b)(1).

Finally, a university must adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action prohibited by the Title IX regulations. 28 C.F.R. § 54.135(b). To ensure that individuals may invoke these grievance procedures and their rights under Title IX more generally without fear of reprisal, Title IX and its regulations prohibit a university from retaliating against, or allowing retaliation against, any individual "for the purpose of interfering with any right or privilege secured by [Title IX]," or because that individual "has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title IX. 28 C.F.R. § 42.107(e); *see* 28 C.F.R. § 54.605 (adopting enforcement procedures of Title VI of the 1964 Civil Rights Act at 28 C.F.R. §§ 42.106-42.111 and applying them to the Title IX regulations).

## CONCLUSIONS REGARDING USU'S COMPLIANCE WITH TITLE IX

I.  **The University Failed to Respond Appropriately to Known Sexual Harassment Creating a Hostile Educational Environment**

Based on our investigation, the Department has determined that the University's failure to respond appropriately to known sexual harassment left some students who experienced the harassment in a sexually hostile educational environment, and rendered additional students vulnerable to sexual harassment and assault. In some instances, USU undertook no investigation. In other cases, the University took insufficient and ineffective corrective action to address or eliminate the sexually hostile educational environment, or failed to identify, take action against, and assess the risk to the University community of individuals who committed serious sexual offenses against fellow students. Some offenders committed additional sexual assaults after an initial report of sexual assault was received by the University.

### A.  The University Knew of Sexual Harassment

The Department reviewed extensive materials documenting that the University had notice of student-on-student and employee-on-student sexual harassment/assault, some of which was very severe, including rape, acts of sex accompanied by physical violence, and touching of intimate body parts. The sexual harassment also included non-consensual acts short of physical contact, such as the unauthorized taking and distributing of photographs or video recordings of sexual acts, stalking in the context of dating or marital relationships, public masturbation, and voyeurism.

The Department found ample evidence that this sexual harassment was sufficiently serious and pervasive to deprive students of access to educational opportunities. The Department confirmed through interviews with students and University records that students withdrew from the University, required counseling, and needed academic supports and/or safety measures to access or benefit from USU's educational program as a result of sexual harassment.

5

Altogether, the numerous University employees and components designated to receive notice of reports of sexual harassment and stop known abuse[3] received over 240 reports of sexual harassment during the Relevant Period.  Many of these notices came through the Title IX Office, which is tasked by the University with the authority to investigate complaints, oversee grievance procedures related to discrimination, institute security measures and no-contact orders, and facilitate academic adjustments and mental health services.  The Title IX Office also selected and conducted sexual assault training for the University.  Several Deputy Title IX Coordinators acted with independent authority without coordination to conduct intake interviews and investigate certain complaints.   The current version of USU's policy on "Discrimination Complaints," Policy 305, states that employees, students, and third parties may report sexual harassment to a Deputy Title IX Coordinator,[4] and for most of the Relevant Period, the University's website designated these deputies as individuals who could receive sexual harassment reports on behalf of the University.

Other offices also received notice of reports of sexual harassment pursuant to USU policies, protocols, manuals, and handouts that instructed students and employees to report sexual misconduct to these other offices or administrators.  For example, the 2016 Code of Policies and Procedures for Students at Utah State University (the "2016 Code")[5] directs students that "all misconduct violations (or suspected misconduct violations) shall be reported to the Vice-President for Student Affairs."[6]  It lists the Title IX Coordinator (and other entities) only as optional, secondary recipients of sexual misconduct reports: "Sexual misconduct violations may also be reported to campus law enforcement, the Title IX Coordinator in the AA/EO Office, or to a Deputy Title IX Coordinator."[7]

The 2016 Code also requires "responsible employees" throughout the University to "report any information they receive about an incident of sexual misconduct to the Title IX

---

[3] *See*, *e.g.*, "What to Do If You Experience Sexual Misconduct" handout, which the Title IX Coordinator described in July 2015 as containing "a detailed table that outlines the different reporting options (plus differences from confidential reporting) both on and off campus.  *See* Email from Stacy Sturgeon to Tyson Budge, July 21, 2015. The table provides information on SAAVI, Counseling and Psychological Services ("CAPS"), Citizens Against Physical and Sexual Abuse, the Title IX Coordinator, Deputy Title IX Coordinators, the AAEO Office, USU Campus Police, Logan City Police Department, Cache County Sheriff's Office, North Logan City Police, Smithfield Police, and the Office of Student Conduct.  *See also* August 2012 SHPT_Handout ("If you feel you are the victim of sexual harassment, you may seek advice and assistance or file a complaint with the USU AA/EO Office … You are encouraged to discuss the issue with your supervisor, advisor, teacher, or somebody in the supervisory chain.  There are several offices on campus that can assist you and possibly provide some support, and you are encouraged to use them as resources.  However, the AA/EO Office has ultimate responsibility for investigating and assisting in the resolution of complaints of sexual harassment at USU.  Some of these other offices include: [CAPS, USU Police, Office of Student Conduct, SAAVI, inter alia].") (emphasis in original).

[4] Discrimination Complaints, 305.4.1.2, available at https://www.usu.edu/policies/305/ (last accessed 9/30/2019).  Notably, the current policy continues to refer students to Deputy Title IX Coordinators, though the University discontinued the designation and role of Deputy Title IX Coordinators in April 2018.

[5] The 2016 Code compiled requirements from a variety of documents in effect over the course of the Relevant Period, all of which the Department reviewed.  For all relevant purposes, the 2016 Code and the documents that preceded it contain substantially similar requirements unless otherwise noted.

[6] 2016 Code, Section V-3.

[7] *Id.*  Coordination issues related to Deputy Title IX Coordinators are discussed in more detail on pages 14-15 below.

6

Coordinator."[8]  "Responsible employees" is broadly defined to include all University employees who meet one of three criteria: those "who have the authority to redress sexual violence, who have the duty to report incidents of sexual violence or other student misconduct, or who a student could reasonably believe has this authority or duty."[9]

The Student Conduct Office, the Athletics Department, Housing and Residence Life leadership, and the USU Police Departments also were authorized by one or more University policies to receive notice of reports of sexual harassment.  Each office had responsibilities that overlapped with the Title IX Office and with one another.  For example, the Student Conduct Office was charged with investigating student misconduct complaints, overseeing applicable misconduct procedures, administering discipline, instituting no-contact directives and other campus safety measures, and facilitating academic adjustments for complainants.  Officials in the Athletics Department had the authority to discipline student-athletes or otherwise curtail their privileges.   Housing and Residence Life leadership could change the parties' housing assignments, and the USU Police Department ("USU PD") could provide additional supervision of an offending student, such as by arrest or enforcement of a no-contact order.[10]  Plainly, notice to any one of these offices of conduct that constituted sexual harassment provided notice to the University.

### B. The University Failed to Respond Appropriately to Sexual Harassment

The Department's investigation found that in many cases the University failed to respond appropriately to sexual harassment of which it had notice.  The Department determined that this constituted a refusal by the University to remedy sexual harassment and bring the University into compliance with Title IX.

The University produced documents demonstrating that, of the over 240 reports it received, it processed fewer than 25 using its Procedures for Grievances Related to Discrimination ("Discrimination Grievance Procedures").  In numerous instances, USU failed to investigate complaints or investigated inadequately.  In other cases, the University took insufficient corrective action to address or eliminate the resulting hostile environment.  In some of the most egregious cases, the University's response system missed evidence of patterns of sexual abuse by serial offenders.

USU's uncoordinated processes for receiving and responding to sexual harassment reports contributed to its failure to investigate individual reports and to recognize patterns of sexual harassment, such as harassment committed by the same perpetrator, thereby allowing the problem to continue and, ultimately, subjecting more students to sexual harassment. ████████

████████████████████████████████████████████████████████████████████

---

[8] *See* 2016 Code, Section II-3.E.II.a and USU February 2017 Summary.

[9] 2016 Code, Section II-3.C.

[10] USU PD consists of 12 full-time and six part-time state certified police officers with the same authority as any municipal or county officer in the state.  *See* https://dps.usu.edu/police/.

REDACTED--FERPA PROTECTED INFORMATION



   A significant breakdown in University procedures and coordination in 2014, 2015, and 2016 resulted in substantial harm to USU students.  Because various offices failed to discuss reports they received with one another—and the University did not have a means of coordinating and tracking reports across the University—officials failed to perceive the pattern of allegations of sexual assault by ████████, and no USU official recognized how substantial a risk the student posed. ███

---

[11] USU's 2016-17 Housing & Resident Life Policy on Rape, Sexual Harassment and Sexual Assault stated that "[a]ll University employees are required to report any instances of harassment, rape or sexual assault to the Director of the Sexual Assault and Anti-Violence Information Office immediately."

REDACTED--FERPA PROTECTED INFORMATION



USU has failed to respond appropriately to numerous other reports of sexual assault and harassment within programs. For example, failures in the University's response system allowed pervasive harassment within the football program more generally to continue unaddressed. The University produced files showing that University offices received notice of more than 15 reports of alleged sexual assault involving USU football players during the Relevant Period. Several players were accused in multiple reports, and two members of the football staff were accused of sexual misconduct: one of sexual assault and the other of sexual harassment. Nonetheless, it was common for the University to close incident files involving the football team after only minimal investigation.



---

[12]

REDACTED--FERPA PROTECTED INFORMATION

███████████████████████████████████████████████████████

The Department found a number of other instances where the University failed to respond appropriately to reports of sexual harassment. In some of these, the complainant declined to initiate formal grievance procedures, but gave the University the respondent's name or description, witness names, a summary of events, the location of the harassment, and other information sufficient to alert the University to the risk of further sexual harassment or violence.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Often, the Title IX Office arranged for academic or other accommodations for a complaining student without either investigating the harassment or assessing whether the report was an indication of a "substantial risk of abuse to students." *See Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1154 (10th Cir. 2006) (citation omitted).

███████████████████████████████████████████████████████

---

[13] In 2016, the University's Code was revised to clarify that "[i]f a student who has experienced sexual misconduct discloses information about the incident to a Responsible Employee, but wishes to maintain confidentiality, or requests that no investigation into a particular incident be conducted or disciplinary action taken, the University must weigh that request against the University´s obligation to provide a safe, non-discriminatory environment for all students, including the reporting student." Section II-3.D.II.b.1. The 2016 Code also requires that the Title IX Coordinator refer such a request to a trained review panel and lists a number of factors that the panel members must consider when assessing whether they can accede to a request for confidentiality. Section II-3.D.II.c. Even after 2016, the Department found inconsistent application of this requirement.

10



The University's files are replete with records that illustrate similar failures by the Housing and Residence Life staff, all of whom (including RAs) USU had designated as "responsible employees."

## C. The University's Failure to Respond Appropriately Subjected Students to Further Harassment

The University's failure to respond appropriately to sexual harassment and assault subjected dozens of students to further sexual harassment.



---

[14] University officials confirmed that the University's student conduct requirements apply with equal force to members of Greek organizations, and that the University can take (and has taken) disciplinary actions against these organizations, such as suspending their privileges to serve alcohol or participate in recruitment activities, when it finds violations.

[15] When the Title IX Coordinator obtained the relevant police reports, they indicated that the complainant had sought confidentiality, in part due to pressure from her sorority sisters, who were friends with the respondent. Despite this notice of pressure by the respondent's friends, the Title IX Coordinator did not interview the sorority members or take any other action to determine whether the rape or ensuing pressure had created a hostile environment in the University's Greek program.

11

REDACTED--FERPA PROTECTED INFORMATION



During the summer of 2015, the University's senior administrators met to discuss a response to the various incidents that had occurred within the Greek community. They suspended two fraternities' privileges to serve alcohol and recruit new members on campus during the 2015-16 school year.



12

REDACTED--FERPA PROTECTED INFORMATION



To the contrary, at the end of the 2015-16 school year, the University allowed the alcohol and recruitment sanctions against the fraternities to expire, sending the message that the University did not take seriously the hostile environment that continued to exist within USU's Greek community.

## II.    The University Did Not Comply with Title IX's Regulatory Requirements

The Title IX regulations contain procedural requirements to help schools prevent and respond to sex discrimination.  The University's failure to effectively implement these requirements led to and compounded its failures to address sexual harassment creating a hostile environment for individual students and across University programs.

### A.    The University's Notice of Nondiscrimination Did Not Comply with Title IX Regulations, Impairing Some Students' Ability to Report Sexual Harassment

Although, during the Relevant Period, the appropriate offices at the University received notice of many sexual harassment reports, the Department's investigation confirmed that flaws in the University's notice of nondiscrimination likely prevented additional timely reports.  Title IX regulations require USU to maintain a notice of nondiscrimination that refers Title IX inquiries to the Title IX Coordinator, and to publish this notice in a variety of University documents and forms. 28 C.F.R. § 54.140.  The purpose of this notice is to ensure that the campus community is aware of the University's obligation to comply with Title IX and to inform the community about where to report potential sex discrimination.  The Department reviewed numerous documents subject to this requirement that either failed to include the notice of nondiscrimination or included a deficient notice.  Such deficient documents included resident handbooks, student orientation guides, student athlete handbooks, and safety and emergency materials.

The impact of USU's failure to disseminate its notice of nondiscrimination adequately was clear from the Department's interviews with current and former students. The results of a USU campus climate survey, conducted by USU in 2017, reflect students' general confusion

13

REDACTED--FERPA PROTECTED INFORMATION

about where to report sexual misconduct. Only about half (48.4%) of the students responding to the survey indicated that they knew where to go to make a report of sexual assault.[16]

The conclusions of a University investigation into a Music Department program indicate that confusion about where and how to report dates back many years. Several complainants came forward in 2018 with years-old allegations, explaining that they had not known where to report discrimination during their time at USU.

### B. The University Failed to Coordinate Its Response to Sexual Harassment, as Required by the Title IX Regulations

The Title IX regulations, 28 C.F.R. § 54.135(a), require a University to "designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under these Title IX regulations, including any investigation of any complaint communicated to such recipient alleging its noncompliance with these Title IX regulations or alleging any actions that would be prohibited by these Title IX regulations." The University's Title IX Coordinator understood, from the outset of her tenure in July 2013, that she was responsible for coordinating the University's compliance with Title IX. However, the University lacked an effective system for coordinating Title IX compliance. Over 50 case files reflect reports of sexual misconduct made to responsible employees or Deputy Title IX Coordinators that did not result in referral to or involvement by the Title IX Office. Additionally, senior USU officials knew for a long time that conflicting and overlapping responsibilities between the Title IX Office and Student Conduct Office led to significant failures to coordinate the University's response to reports of sexual harassment. Nonetheless, USU failed to take sufficient steps to train these employees in its Title IX programs and procedures or otherwise address these issues.

For significant portions of the Relevant Period, the employees designated by USU to receive sexual harassment reports were unaware that they had an obligation to refer reports of sexual assault to the Title IX Office specifically. Many referred reports to other components. One example is the Associate Director of the Student Involvement and Leadership Center, tasked with overseeing Greek life at USU. Despite being employed by that office since 2008, he did not learn that he had a duty to report sexual harassment until he attended a 2013 or 2014 training led by the Title IX Coordinator. Even thereafter, until 2016, he believed he was to report sexual harassment to the Student Conduct Office, and did so without correction from that office. Information that he reported to the Student Conduct Office often did not reach the Title IX Coordinator.

---

[16] Even this percentage is likely high, given that the survey did not confirm whether students were accurate in their understanding of where to report.

REDACTED--FERPA PROTECTED INFORMATION

The manner in which the University utilized Deputy Title IX Coordinators posed perhaps the greatest challenge to the Title IX Coordinator's coordination efforts. The Title IX Coordinator reported to the University Provost, one of several administrators who, in turn, reported directly to the President. When the Title IX Coordinator assumed her role, she inherited the Deputy Title IX Coordinators[17] who worked in a variety of offices across the University, reported to senior administrators other than the Provost or Title IX Coordinator, and had varying scopes of corrective action that they could take in response to sexual harassment. During the Relevant Period, University policies and resources, including its website, listed these individuals as Deputy Title IX Coordinators and encouraged the campus community, including students and responsible employees, to report sexual misconduct complaints to either the Title IX Coordinator or a Deputy, such as the Vice-President for Student Affairs.[18] By at least late 2013, the Title IX Coordinator repeatedly reported to the Provost in monthly supervisory meetings that she lacked control over certain deputies. For nearly three years, the Provost knew that Deputy Title IX Coordinators—specifically those in the Student Conduct Office—continued to receive and resolve complaints without authority from or coordination with the Title IX Coordinator, yet did not stop the practice.

The consequences of poor, ineffective coordination are illustrated by the way sexual harassment complaints were handled in the Housing and Residence Life Office. Numerous incident reports showed that when Housing and Residence Life employees received notice of sexual harassment, they assisted complainants in getting counseling and medical services, accompanied them to meetings with law enforcement, and even helped them cancel their housing contracts when they decided to leave school because of the harassment. But, they did these things without notifying the Title IX Office. Consequently, complaints went uninvestigated, assessments were not made of whether sexual harassment occurred, no one evaluated whether the accused student posed a risk to the greater campus community, and some students left the University without a full understanding of the academic support available to help them stay.

This problem was not isolated to Housing employees. During interviews, various Student Conduct and Title IX Office staff, as well as supervisory administrators overseeing those offices, admitted that USU's Student Conduct Office, was routinely handling sexual harassment investigations without sharing information with the Title IX Coordinator. Although the Student Conduct Office was able to offer academic accommodations and issue sanctions for misconduct, they did not use the Discrimination Grievance Procedures on which the Title IX Office relied, instead relying on the Procedures for Misconduct Proceedings ("Misconduct Procedures") to address reports of sexual harassment or assault.

The Misconduct Procedures, as delineated in the 2016 Code, differ in important ways from the Discrimination Grievance Procedures. For example, the Misconduct Procedures offer no timelines for completion of an investigation while the Discrimination Grievance Procedures state that an investigation should be conducted within 35 days.

The appeals processes are also different. The Misconduct Procedures suggest that only the respondent may file an appeal, while the Discrimination Grievance Procedures give both

---

[17] The Deputy Title IX Coordinators were designated as such by the previous Title IX Coordinator.

[18] See, e.g., 2016 Code, Sections II-3.F.I and V-3.

15

complainant and respondent the right to appeal. The number of appeals available and the
ultimate decision-makers also differ depending on the procedure used. Ultimately, differences in
the manner in which Student Conduct Offices and the Title IX Offices investigated complaints
and handled appeals meant that the University provided for different investigative procedures,
rights, and obligations depending on where students reported.

Similarly, students who reported sexual harassment or assault to USU PD routinely did
not receive all the services and supports available to them at USU. During much of the Relevant
Period, USU PD did not refer matters to Title IX officials or consistently share information about
the Title IX Office or SAAVI with alleged victims.[19]  Instead USU PD conducted a criminal
investigation (when it deemed the circumstances appropriate to do so) and then local prosecutors
assessed the likelihood of success at trial to determine whether to proceed with prosecution. If
the matter was not prosecuted, USU PD could only offer the complainant a safety escort.
(Rarely, USU PD assisted the complainant with a no-contact order.) Had USU PD notified the
Title IX Office of these reports, that office could have investigated the reports of sexual
harassment to determine whether a hostile environment existed, and offered supports like
academic and housing accommodations, counseling, a leave of absence, or tuition
reimbursement.

From 2013 to 2016, high-ranking University officials, including the University Provost
and the Vice-President for Student Affairs, were aware that the University had no employee
effectively coordinating its compliance with Title IX in violation of 28 C.F.R. § 54.135(a), yet
failed to take necessary action to rectify the problem. Finally, in July 2016, media reports
relating to a student athlete accused of sexual assault prompted the University to conduct an
internal investigation into its handling of sexual assault reports. In response, around November
2016, University officials, including the then-President of the University, its Provost, and the
University's general counsel, notified certain Deputy Title IX Coordinators that they were to
report all matters involving sexual misconduct to the Title IX Coordinator, who was to
coordinate and investigate such reports. By early 2017, the University introduced a sexual
misconduct reporting form through its new electronic recordkeeping system. The form, together
with additional training overseen by the General Counsel's Office, improved reporting to the
Title IX Office. Ultimately, during the Department's investigation, the University terminated the
role of Deputy Title IX Coordinators entirely.

Thus, even though the University had technically designated the AAEO Director as Title
IX Coordinator, the designation was nominal until approximately November 2016. Prior to that,
the University's failure to train and monitor the actions of employees it had designated as
responsible employees and Deputy Title IX Coordinators made it impossible to coordinate
USU's compliance efforts, spot patterns, address noncompliance, and eliminate a hostile
environment where it existed. Consequently, the University failed to respond effectively and
consistently to sexual harassment reports by individual students and recognize patterns of sexual
misconduct that harmed dozens of students.

---

[19] The Department's interviews with University officials, including officials from USU PD, and local law
enforcement confirmed that communications did improve in early 2017, shortly after the appointment of a new
police chief.

REDACTED--FERPA PROTECTED INFORMATION

### C. The University Failed to Train Employees Adequately to Refer Sexual Harassment Reports to the Title IX Coordinator

As part of the University's coordination failures from at least 2013 to 2016, particularly with respect to the Deputy Coordinators, the University violated Title IX regulations by failing to train the deputies adequately regarding matters such as: the type of conduct prohibited by Title IX; how to implement the University's Title IX procedures; their role in implementing those procedures; and how to report and document matters for the Title IX Coordinator. For example, in her interview, the Director of Housing and Resident Life, who served as a Deputy Title IX Coordinator, stated that from spring 2014 through late 2016 or early 2017, she did not understand that she was required to report sexual harassment matters to the Title IX Coordinator, but rather thought such a referral was simply one option. Likewise, she did not recall receiving guidance from the Title IX Coordinator regarding record retention. Only when the University implemented an electronic database for complaint recordkeeping that would automatically notify the Title IX Office of Title IX complaints did the Director of Housing and Resident Life understand that she needed to report all matters regarding sexual assault. Due to this failure in training, in the years preceding the database rollout, Housing employees received many reports of rape and other serious sexual assaults that were not reported to the Title IX Office.

Other Deputy Title IX Coordinators expressed confusion about their responsibilities. For example, one recalled receiving student reports of sexual assault from 2014 to 2016. However, based on the training and guidance she had received, she did not believe the information warranted referral, because she did not know the identity of all the relevant parties, ████ ████████████████████████ At the time of her interview with the Department, in April 2018, she did not know whether she was still serving as a Deputy Title IX Coordinator for USU.

### D. USU Failed to Adopt Grievance Procedures Providing for Prompt and Equitable Resolution of Sexual Harassment Complaints

The Title IX regulations require recipients to adopt and publish grievance procedures for the prompt and equitable resolution of sex discrimination complaints. 28 C.F.R § 54.135. The University failed to do so, instead addressing complaints of sexual harassment under various contradictory procedures, without a consistent policy on which procedures would apply. Documents with potentially overlapping applicability to sexual harassment include Policy 339, "Sexual Harassment;" Policy 305, "Discrimination Complaints;" Policy 303, "Affirmative Action/Equal Opportunity;" 2016 Code Art. VII, "University Regulations Regarding Discrimination and Harassment;" 2016 Code Art. V, "University Regulations Regarding Student Conduct;" and Policy 407, "Academic Due Process [for Faculty]: Sanctions and Hearing Procedures." Additionally, USU sometimes applied Article VIII of the 2016 Code ("University Regulations Regarding Hearing Boards") to Title IX matters, despite that article's express statement that it did not encompass sexual harassment: "A hearing board shall hear all incidents involving alleged violations of University Standards [. . .] and all grievances *not* relating to discrimination or harassment. *Complaints of discrimination, including complaints of sexual misconduct, shall be handled in accordance with USU Policy 305.*" (emphasis added).

17

REDACTED--FERPA PROTECTED INFORMATION

These various procedures differed in important ways. Specifically, provisions of the 2016 Code were internally inconsistent with regard to sexual harassment.[20] Various USU policies differed with respect to lengths of time for an investigation;[21] standards for assessing a complainant's request for confidentiality;[22] appeals procedures;[23] and standards for finding a violation.[24] Regardless of the procedures the University used (when it followed any at all), the University routinely failed to provide a prompt and equitable resolution of the complaint at hand.

With respect to promptness, the University President acknowledged concerns about the duration of investigations and explained that she had instructed the Title IX Coordinator to complete investigations in a more timely fashion. Some cases were delayed because relevant University officials inappropriately treated sexual harassment reports as general inquiries that, they believed, did not trigger USU's duty to respond.

The Title IX Office delayed other complaints, sometimes for months, waiting for the respondent to meet with the relevant officials or identify potential witnesses. Although a school's grievance procedures should allow both respondents and the complainants to offer evidence and witnesses, it should not allow either party to misuse the procedures to delay an investigation. The University's procedures did not specify time frames for either party to

---

[20] 2016 Code, Article VII, University Regulations Regarding Discrimination and Harassment, sets forth a separate grievance procedure from 2016 Code, Article V on Misconduct Proceedings. Article VII circularly states: "Where an occurrence or incident relating to a grievance could be processed either as a disciplinary action or grievance, it shall be processed as a discipline matter under Article V; however, if the grievance also relates to discrimination or harassment, it shall be processed under this Article (Section VII-3) to utilize the expertise of the [AAEO Office]." When asked to clarify this inconsistent guidance, the University's Associate Vice President for Student Affairs acknowledged, "There is no good squaring of this."

[21] *Compare* 2016 Code, Article VII.E.5 (the inquiry/investigation should be completed within 35 days) *with* Policy 305 ("the investigation will be completed within sixty (60) calendar days of filing the complaint; however, the AA/EO Director/Title IX Coordinator may adjust deadlines upon good cause").

[22] *E.g.*, Policy 407.10 and 407.11.3 (the accused will not be informed of the complaint without the complainant's consent); 2016 Code, Section II-3.A (while the complainant may request confidentiality of non-confidential resources, USU will balance the request with other factors); Policy 305.4.2.4 (if the complainant chooses not to file a complaint, "the AA/EO Office may file a Complaint if there is sufficient reason to believe that discrimination/harassment has occurred").

[23] The relevant policies provide that appeals go to either the Affirmative Action Appeals Committee or the Student Conduct Hearing Board. Policy 305 Section 4.4, Appeals, is silent on the distinction and interplay between the two and does not specify the involvement, if any, of the Title IX Coordinator. The Athletics Handbook states that: "[o]ne appeal procedure is specific to student athletes and addresses issues relating to financial aid [including transfers]." It is not clear which, or how many, of these appeals processes could be used to adjudicate a single matter, or how multiple appeals would impact the time necessary to finalize the University's decision.

[24] The legal standards that the University applies to charges of sexual harassment appear variously as "probable cause to believe" there has been a violation (Resident Handbook for Family Student Housing at 24); "reasonable basis" (Policy 407.11); "where there is reasonable cause that … violence has occurred" (2016 Code, Section V-3.B.23.a); and "preponderance of evidence" that a violation occurred (2016 Code, Section V-5.B., Policy 305.3; Policy 339.2).

18

provide witnesses or evidence; the Title IX Coordinator said that the timing could vary from case to case. The case files provided by the University confirmed this inconsistency, as USU often asked respondents to provide information without any suggested deadline and simply kept cases open until the respondent decided to provide it.



Ineffective communication between local law enforcement and the Title IX Office also led to needless delay.

## **CONCLUSION**

The Department's investigation uncovered significant failures in the University's handling of complaints of sexual harassment, including sexual assault. The Department notes the University's expressed commitment to address and prevent sexual harassment, including sexual assault. To resolve the issues and failures identified above and to bring the University into compliance with Title IX, the University must take specific and concrete steps to:

1. Designate an effective Title IX Coordinator to coordinate the University's efforts to comply with and carry out its responsibilities under Title IX, including the investigation of sex discrimination complaints;

2. Draft and appropriately disseminate a notice of nondiscrimination that 1) notifies the campus community that USU neither discriminates nor condones discrimination on the basis of sex in its programs or activities and 2) provides correct contact information for the Title IX Coordinator;

3. Ensure that the individuals designated to coordinate and implement its Title IX efforts receive adequate training and coordinate these efforts effectively;

19

4. Revise the University's policies, procedures, and investigative practices to provide a cohesive and effective grievance procedure that ensures prompt and equitable resolution of allegations of sexual harassment, including sexual assault;

5. Provide comprehensive and effective training to all students, faculty, and staff that gives notice of the University's prohibition of sexual harassment, including sexual assault; information about reporting options, duties, and obligations; details on where to go for help or assistance; and information on grievance procedures and potential outcomes;

6. Adequately investigate or appropriately respond to all allegations by students who allege sexual harassment, including sexual assault, and/or allegations of retaliation in connection with reports of sexual assault or sexual harassment; and

7. Consistently and appropriately process complaints of sexual harassment, including sexual assault, and retaliation, using the University's revised grievance procedure.

The Department looks forward to discussing with the University possible remedial measures that can help bring USU into compliance with its obligations under Title IX. The Department appreciates the cooperation of the University, its administrators, faculty, staff, and students, throughout the course of this investigation and looks forward to continuing to work with the University to resolve all outstanding concerns. If you have any questions regarding this letter, please do not hesitate to contact Victoria Lill ██████████████████ or Amanda Dallo ██████████████████.

Sincerely,

Shaheena Simons
Chief
Educational Opportunities Section
Civil Rights Division

Sandra L. Steinvoort
Assistant United States Attorney
District of Utah

cc: Mica McKinney, Esq., General Counsel, Utah State University

REDACTED--FERPA PROTECTED INFORMATION