# EXHIBIT 12



*U.S. Department of Justice*
*Civil Rights Division*
*Educational Opportunities Section*

*United States Attorney*
*District of Utah*

---

SS:AD:VL:BB:CB:DV:VS  
DJ 169-77-25  
USAO 201700003

Educational Opportunities Section  
4 Constitution Square  
150 M Street, N.E., Rm. 10.1125  
Washington, D.C. 20002

August 21, 2024

**By Electronic Mail**
Mica McKinney, Esq., General Counsel
Utah State University
Old Main Hill
Logan, Utah 84322
Mica.McKinney@usu.edu

      Re:    Compliance Monitoring of February 12, 2020 Settlement Agreement between the United States of America and Utah State University

Dear Ms. McKinney:

      The U.S. Department of Justice (the "Department" or "DOJ"), through its Civil Rights Division and the United States Attorney's Office for the District of Utah, writes about the Department's compliance monitoring of the February 12, 2020 Settlement Agreement (the "Agreement") between the Department and Utah State University (the "University" or "USU"). The Agreement was intended to address the Department's findings that the University violated Title IX of the Education Amendments Act of 1972 ("Title IX"). The Agreement therefore requires remedial relief to achieve a shared goal of addressing "the University's obligations under Title IX to stop and prevent the recurrence of sexual harassment that creates a hostile learning environment, including sexual assault, and to provide clear, consistent, and equitable policies and grievance procedures that provide for prompt and equitable resolution of student and employee complaints alleging conduct that is prohibited by Title IX." Agreement at 2.

      Pursuant to Section IX.B of the Agreement, this letter serves as notice to the University of the Department's determination of USU's substantial non-compliance with the requirements of the Agreement. Specifically, the University has failed to take prompt, equitable, and effective steps to remedy an ongoing hostile environment within its football program, as required by Section VII.A of the Agreement. *See also* Terms of the Agreement at 2. Additionally, the University has failed to establish criteria for and a process by which the Title IX Coordinator and the Athletics Department will determine appropriate interim measures during the grievance

investigation and adjudication process, as required by Section III.C.9. This failure has contributed to the University's inadequate response to the hostile environment that persists in the football program.

In the Department's October 2, 2019 Notice Letter to the University, DOJ detailed pervasive harassment within the football program that had gone unaddressed by the University. Over the course of its compliance monitoring, the Department has consistently shared with USU its concerns about the environment within the football program. For example, during an August 18, 2021 call, the Department and USU agreed that the University would look more closely at how the University's Office of Equity ("OOE") coordinates and communicates with the Athletics Department on Title IX matters and would work to develop related policies and procedures, as required by the Agreement. To date, the University has not developed such policies and procedures. The Department expressed continued concerns about the climate and culture within the football program during teleconferences with the University on March 7, 2022 and April 11, 2022. On February 24, 2023, DOJ once again sent a letter to the University citing its noncompliance with the Agreement due, in part, to its failure to address an ongoing sexually hostile environment within its Athletics Department, particularly within the football program. Based on DOJ's compliance monitoring, issues remained, and we had additional teleconferences to discuss our concerns on March 29, 2023, February 15, 2024, June 20, 2024, and most recently on July 15, 2024.

Four and a half years after our initial notice to the University of our findings regarding the football program, there continues to be alarming evidence of a pervasive, sexually hostile culture and climate within the football program and in (now former) senior leadership in the Athletics Department. This environment has been allowed to grow and fester due to repeated ineffective, inequitable, and untimely responses by the University, including the OOE and the Athletics Department. In this letter, the Department sets forth the facts of two separate incidents of Sexual Misconduct connected to the football program and Athletics Department, along with the University's failures to adhere to its own policies and procedures designed to effectively, equitably, and promptly address these incidents and their effects. The Department's determination is based on review of each relevant Incident Report ("IR"), related OOE case files, police reports, and interviews with OOE staff. The Department also relies on an external investigative report about the football program that was commissioned by the University and issued on June 5, 2024 ("the June 5th Report").[1] That report describes an independent, third-party factual investigation and review of football program and Athletics Department staff members' alleged noncompliance with the University's Title IX policies and procedures.[2] The University produced the June 5th Report to the Department on June 12, 2024, in response to the Department's May 29, 2024 request for information.

---

[1] Throughout this letter, we cite the June 5th Report where we have relied on it. Where we do not cite the report, we came to the information independently.

[2] This external investigation included interviews with USU employees, and the review of thousands of emails and texts captured by a forensic expert using established search terms, OOE case files, relevant police reports, and handwritten journal entries from Interim Athletic Director Jerry Bovee and head football coach, Blake Anderson, among other documents.

2

I.   **Relevant University Policies**

   a.  **USU Policy 340**

The University's Policy 340: Required Reporting of Sexual Misconduct ("Policy 340" or "the Policy") states that Reporting Employees are required to report *all* information they receive about incidents of Sexual Misconduct[3] to the Title IX Coordinator within 24 hours of receiving the disclosure. *See* Policy 340, Section 2.1.1 (emphasis added). Reporting Employees (which include all members of Athletics Department leadership, as well as all football team coaches and support staff) must submit an IR using an online form and must include all known information disclosed to the Reporting Employee. *See id.* A single IR can be submitted by an individual Reporting Employee or multiple Reporting Employees, as long as all Reporting Employees are named on the IR and every Reporting Employee has provided all information known about the Sexual Misconduct in the IR. *See id.* Importantly, Section 2.1.2 of Policy 340 states that "Reporting Employees receiving such a disclosure should not investigate allegations of Sexual Misconduct." Consistent with Section 2.1.4 of the Policy, Reporting Employees who fail to adhere to Policy 340 may be subject to corrective action, up to and including termination of employment. Reporting Employees receive mandatory annual training on their obligations under Policy 340.

   b.  **Student-Athlete Handbook**

The 2022-2023 Student-Athlete Handbook ("Handbook"), which governed at the time of the allegations discussed in this letter, also contains provisions relevant to the facts at hand. The Handbook's Notification Policy states:

> "A student athlete who is arrested, cited for a misdemeanor/felony, questioned by the police or court personnel for any reason, or who receives a subpoena must notify his/her head coach within eight hours of the incident. Failure to do so may result in immediate removal from the team and loss of scholarship, including an end to all student-athlete amenities and facilities such as strength and conditioning, academic services, training room, training table, fueling station, etc. Upon notification, the head coach has the institutional responsibility to report the arrest/citation/etc. immediately to his/her sport supervisor so the appropriate notice of the situation may be immediately forwarded to the Director of Athletics and the Office of Student Conduct, and, if necessary, the President of the University. The Director of Athletics, in consultation with the head coach and sport supervisor, will determine additional disciplinary action based upon the individual circumstances of any misconduct. Possible action may include suspension/removal from the team, cancellation of scholarship, community service, educational initiatives, etc."

---

[3] The Policy defines Sexual Misconduct to include relationship violence, sexual harassment, sexual assault, and sex-based stalking.

3

## II. USU's Non-Compliance

### a. Failures in Reporting within USU's Athletics Department and Football Program

*Background*

OOE case files reveal that in Spring of 2023, a football player was arrested for alleged criminal Sexual Misconduct.[4] That football player did not report his arrest to the football coaching staff within eight hours, as required by the Handbook's Notification Policy.[5] After the football player missed scheduled football events, coaching staff, including head coach Blake Anderson, approached the football player about his absence. June 5th Report at 11-12. In a meeting with the football player, which Anderson identified to investigators as having taken place approximately 5-6 days after the arrest, the football player admitted to Anderson he had been arrested but was adamant that he was innocent of the charges. *Id.* at 12, 13. In support of his claim, the football player told Anderson that he believed the alleged victim, who was known to the football player, would support his innocence. *See id.* at 12.

Instead of reporting all this information to the OOE as required by Policy 340 and allowing the OOE to investigate the matter under applicable University policies and procedures, Anderson told investigators that he conducted his own independent "fact-finding mission" into the allegations of Sexual Misconduct, while the football player remained on the team without suspension. *See id.* Anderson insisted that he did not act alone in his efforts, but that he and Jerry Bovee, the Acting Athletic Director at the time, jointly decided to gather more facts before taking any disciplinary action against the football player. *See id.* Anderson told investigators that Bovee suggested they first try to determine if the football player was somehow "being 'targeted'" before taking any further action, including suspending him from the team. *Id.* Not only did Anderson meet with and question the football player on numerous occasions about the allegations, Anderson also met privately in person with the alleged victim to get her account of what happened. *Id.* at 12-13. Upon hearing from the alleged victim that she disputed the criminal charges, Anderson told the alleged victim that if she wanted to be a "part of the process," a written statement detailing the football player's innocence would be important to

---

[4] To protect the privacy of the student athlete, alleged victim, and student witnesses, consistent with the Family Educational Rights and Privacy Act ("FERPA") (20.U.S.C. § 1232g; 34 CFR Part 99), this letter describes events without using names, precise dates, and the particulars of the sexual misconduct alleged. The University has the specific dates, names, and relevant facts discussed in this letter, but can contact the Department for confirmation as necessary.

[5] The Handbook states that "[f]ailure to do so may result in immediate removal from the team and loss of scholarship, including an end to all student-athlete amenities and facilities such as strength and conditioning, academic services, training room, training table, fueling station, etc." But the student athlete faced no known consequences as a result of his failure to timely report his arrest. In fact, Anderson reported to investigators that he did not believe the Athletics Department had any written rules requiring student athletes to self-report law enforcement issues. June 5th Report at 7. This raises questions about whether Athletics Department staff and student athletes are appropriately trained on or otherwise made aware of the rules set forth in the Handbook, and how many other football players may have violated this rule without consequence.

have in his file. *Id.* at 13.  He told investigators he suggested to her that she think about what she wanted to share and "put it on paper." *Id.*  After learning that another football player may have witnessed the Sexual Misconduct, Anderson also interviewed that player and solicited a written statement from him supporting the accused football player. *Id.*  Anderson exchanged text messages with both the alleged victim and the football player witness about collecting their written statements. *Id.* at 14, n.17.

  According to Anderson, he provided Bovee with the two written statements he received and the two of them discussed all the information Anderson had gathered.[6]  *Id.* at 13.  Anderson indicated that Bovee attempted, unsuccessfully, to gather additional information about the charges from the police and prosecutor.  *See id.*  Anderson explained to investigators his decision to meet with witnesses and collect statements, saying that "[w]e are on a fact-finding mission here; we will act once we have information to act upon." *Id.* at 12.  The accused football player entered the transfer portal shortly after Anderson's interviews with witnesses, *id.* at 10, 13, effectively ending his membership on USU's football team and communicating his intent to play football at another university.  The Athletics Department's decision to not suspend the football player permitted him to enter the transfer portal without any indication of the alleged criminal Sexual Misconduct on his record, preventing USU from properly informing interested universities about an open misconduct matter, as required by National Collegiate Athletics Association ("NCAA") rules.[7]  Additionally, as the June 5th Report correctly notes, "allowing [the student athlete] to continue being part of the team despite being arrested for [criminal Sexual Misconduct] could have indirectly communicated to other members of the team that such issues were not always taken seriously." *Id.* at 32.

  Curiously, when asked by investigators about the suspension protocols in place for athletes accused of sexual violence, Anderson initially stated that the Athletics Department has a "zero tolerance" policy for the specific type of Sexual Misconduct alleged. *Id.* at 7.  Bovee also indicated it was "fairly standard" that any time an athlete was arrested for sexual assault or a felony, they would be immediately suspended from the team. *Id.* at 6, 16.  When asked how Anderson could reconcile a zero-tolerance policy with his decision not to suspend a football player charged with criminal Sexual Misconduct, he explained that other matters resulting in an immediate suspension or dismissal from the team were "cut and dried," whereas two witnesses in this matter provided him information that conflicted with the criminal charges filed. *Id.* at 12-13.  Bovee also defended the decision not to suspend the football player, telling investigators that because the team was ending spring football, there was nothing to suspend him from. *See id.* at 16.  Anderson repeatedly justified his unauthorized "fact-finding mission" and his failure to suspend the football player by saying he felt he needed to "be fair" to him.  See *id.* at 12.

---

[6] In Bovee's interviews with investigators, he admits to knowing about Anderson's efforts to investigate, receiving the statements, and discussing the evidence gathered with Anderson.  *See* June 5th Report at 15-18.  Although Bovee did not state that he did any active investigating, he also did not indicate that he made any attempts to stop Anderson's independent fact-gathering.

[7] Despite the Athletic Department's failures, the OOE case file shows that, ultimately, the OOE received notice of the criminal allegations just before the football player entered the portal and was able to notify an interested university that the football player was the subject of a pending Title IX matter.

5

Anderson failed to acknowledge that treating the football player "fairly" under Title IX would have required Anderson and Bovee to report all the information they knew to the OOE so that the football player would be subject to the same Title IX policies and procedures applicable to every other student respondent at USU. Instead, the football player received special treatment by Anderson and Bovee, who seemingly went out of their way to protect him. Indeed, Anderson revealed to investigators that he told the football player that he was concerned about how the pending charges might compromise his football prospects given that the player had shown interest in entering the transfer portal. *Id.*

*Athletics Department and Football Staff Members' Policy Violations*

Anderson's and Bovee's conduct violated Policy 340 in two ways. First, Anderson conducted his own investigation into allegations of Sexual Misconduct, which Policy 340 expressly prohibits. *See* Policy 340, Section 2.1.2.[8] By Anderson's account, Bovee was a participant and overseer of this "fact-finding mission."[9] *See* June 5th Report at 12-13. By Bovee's account, he discussed Anderson's investigative efforts and the evidence he obtained with Anderson, *see id*. at 16, although he does not admit to actively participating in gathering evidence. At a minimum, Bovee admitted he was aware of Anderson's investigation and, as his direct supervisor, did nothing to stop it. As discussed further below, Amy Crosbie, Executive Associate Athletics Director, also failed to report to the OOE her knowledge about Anderson's interview with the alleged victim and the written statement the alleged victim provided to Anderson. *Id*. at 15.

Second, Anderson, Bovee, and Crosbie, along with Austin Albrecht, Director of Player Development for the football team, failed to report all the information they knew about the alleged incident via an IR to the OOE. For example, the football player told Albrecht about his arrest, but Albrecht failed to report this information to the OOE via an IR, as required. *See* June 5th Report at 29-30. Anderson also admitted that he did not report to the OOE the football player's arrest, any information about his meetings with key witnesses, or the statements provided to him, stating that he was not aware he needed to do so given that the alleged

---

[8] USU's annual training for Reporting Employees, including those delivered to the Athletics Department, also emphasizes that Reporting Employees are not investigators and should not try to determine the truth or severity of what happened before making a report to the OOE. The training, which has been reviewed and approved by the Department, is clear that even if a Reporting Employee is unsure if the allegations are true, they still must report all known information to the OOE, whose role is to investigate further as a neutral party. The training also explains that the purpose of Reporting Employees' obligation is to ensure a centralized (as opposed to siloed) response to Sexual Misconduct. Specifically, reports to the OOE allow that office to: (1) identify safety concerns and patterns of Sexual Misconduct, (2) create an equitable and consistent response to Sexual Misconduct by taking certain action to address or stop it, and (3) connect individuals to University and community resources and reporting options.
[9] While the Handbook provided the Director of Athletics, in consultation with the head coach, the ability to determine disciplinary action based on the individual circumstances, the Handbook does not supersede Policy 340 and neither grants Athletics Department employees the right to conduct their own investigation, nor removes their obligation to report to the OOE. When a report is made by Athletics Department employees to the OOE, the Athletics Department and the OOE can and should work together to determine appropriate interim measures during any grievance investigation and adjudication process.

misconduct took place off campus and was "dealt with by authorities." *Id.* at 14, 28. Importantly, USU's Policy 340 is clear that "Reporting Employees are required to report all information they receive concerning incidents of Sexual Misconduct to the Title IX Coordinator" – it does not limit the obligation to report to incidents that occur on campus. Policy 340, Section 2.1.1. Moreover, Policy 340 includes a section on three exceptions to Reporting Employees' reporting obligations, none of which are that the alleged misconduct occurred off campus or was handled by local law enforcement. *See* Policy 340, Section 2.1.3.[10] The Policy is patently clear that if a Reporting Employee "is unsure whether to report the information to the Title IX Coordinator, they should err on the side of reporting the information." *Id.*

While Anderson speculated that Crosbie may have filed a group report to the OOE, he did not recall anyone telling him that she planned to do so. *Id*. at 14. Anderson also stated that he did not recall Bovee telling him that Bovee had reported the arrest to Student Conduct or Title IX personnel, although he said it would not be uncommon for Bovee to do so. *Id*. OOE case files show that Bovee did report the arrest to Eric Olsen, Vice President of Student Affairs, shortly after Bovee learned of it. Olsen then filed an IR with the OOE immediately after learning of the arrest from Bovee, and indicated within the IR that he was filing the report on behalf of himself, Crosbie, and Bovee. Notably, Policy 340 states that multiple Reporting Employees may submit a single IR, as long as all Reporting Employees are named on the IR and every Reporting Employee has provided all information known about the Sexual Misconduct in the IR. *See* Policy 340, Section 2.1.1. Here, the IR named Olsen, Crosbie, and Bovee (not Anderson) and only reported the fact of the arrest. It did not contain any additional information about how Bovee or Crosbie became aware of the arrest or any additional knowledge they had about Anderson's interviews with witnesses, which were occurring around the date of their report.

Beyond their initial failures as Reporting Employees to immediately report everything they knew about the football player's arrest to the OOE via an IR, Anderson and Bovee also had an ongoing obligation to report all known information about the incident to the OOE. *See id.* Although Bovee told investigators that he recalled receiving the witness statements from Anderson and telling Anderson that they would need to file a report with the OOE, Bovee never filed such a report. *See id.* at 16-18. Bovee further stated that he thought Anderson had provided those statements to the OOE, *see id.* at 16, but Bovee failed to check with Anderson or the OOE to ensure they had been provided. Bovee wrote in his notebook that "Blake shared 2 letters with me. One from a teammate who was apparently there as a witness and another from [the alleged victim]. Those letters are filed in my football file." *Id.* at 17. Bovee did not recall sharing the statements with anyone, including the OOE. *Id.* at 16. He maintained that he thought Anderson

---

[10] USU's mandatory annual training for Reporting Employees, including those delivered to the Athletics Department, also explains that Reporting Employees must report information about alleged Sexual Misconduct if *any* of the following are true: (1) the claimant is or was a USU student, employee, or program participant, (2) the respondent is or was a USU student or employee, or (3) the incident happened during or in connection with a University employment or education program or activity. The training further clarifies that Reporting Employees must report incidents that involve a USU student or employee, even if they took place outside of a USU program or activity. This would encompass alleged incidents where a student or employee is subject to or commits Sexual Misconduct off-campus.

provided the statements to the OOE, *id.,* though it is unclear why. Regardless of what Bovee and Anderson may have thought about what others had done, both employees were independently required to report all known information about a Sexual Misconduct matter to the OOE. *See* Policy 340, Section 2.1.1. Similarly, Crosbie told investigators that she was aware that Anderson spoke with the alleged victim, who had provided him a written statement. June 5th Report at 15. Crosbie also failed to report this information to the OOE. Indeed, in a July 14, 2024 call with DOJ, OOE staff maintained that they first learned of Anderson's interviews and the existence of written witness statements from the June 5th Report.

Policy violations aside, Anderson's and Acting Athletic Director Bovee's actions (and inaction) show a gross lack of professional judgment and blatant disregard for USU's Title IX policies and procedures, on which they were trained annually. By interviewing and soliciting statements from witnesses to an alleged crime outside of the proper University process and without coordination with law enforcement, Anderson potentially jeopardized a criminal investigation and infringed on the benefits conferred by the Agreement as related to the University's Title IX grievance process.[11] This is even more true as the statements Anderson solicited, in violation of Policy 340, were inconsistent with the events as detailed in the police report and with the accounts of other key witnesses, whose eyewitness reports were unknown to Anderson and Bovee. Anderson interviewed these witnesses without having read the police report (which was not yet made available to anyone at USU) and with no independent knowledge about the alleged events. Furthermore, Anderson's interviews and requests for exonerating statements may have felt coercive to the witnesses due to a power imbalance between Anderson – a prominent and powerful individual in the USU and Logan community – and the individuals he interviewed. Indeed, the accused and one witness were football players, over whom Anderson had a great deal of power and authority. Bovee and Crosbie not only failed to report what they knew to the OOE, they also failed to address with Anderson, their supervisee, the inappropriate nature of his actions and the harm he could have caused not only to the alleged victim, but the active police investigation. Athletics Department leadership cannot and should not allow their coaching staff to conduct their own investigations into Sexual Misconduct. Doing so communicates to student athletes, and the broader campus community, that athletes are subject to an alternate system of accountability that is not afforded to other members of the community and fails to adhere to the University's own policies and procedures for complying with Title IX.

---

[11] Notably, the OOE, along with many police departments, are trained to conduct witness interviews in sexual assault and domestic violence cases using trauma-informed interview techniques that demonstrate sensitivity to the experience of sexual assault and domestic violence survivors. *See* Section V.F.1.c of the Agreement ("Training for [USU's Title IX Coordinator and investigators] should include trauma-informed interviewing techniques… .") Trauma informed interviewers, for example, bring with them an understanding that sexual assault and domestic violence survivors often feel reticent to pursue criminal or other charges against their perpetrator for a variety of reasons and often have a difficult time recalling certain aspects of their assault or abuse. Such interviewers also work to minimize secondary trauma often experienced by a survivor who must relive their experience of assault or abuse during the interview. The alleged victim here was subjected to questioning about a potentially traumatic event by her alleged perpetrator's coach without the benefit of trauma informed techniques.

*The OOE's Failure to Promptly and Effectively Respond*

As noted earlier, the OOE did receive a timely IR from Olsen, who filed as soon as he had notice of the arrest, which had occurred seven days before his report. As a result, the OOE had notice of the allegations of Sexual Misconduct and was positioned to take steps to respond. Based on our review of the relevant OOE case file, the OOE immediately engaged the safety assessment process, and took appropriate efforts to ensure the football player did not pose an immediate threat to the campus community. Additionally, the OOE promptly issued public records requests to all area police departments seeking the relevant police reports to further its investigation.

USU did not receive the police report connected to the Spring 2023 allegations for another two months. OOE case files reveal that within days, however, USU received a *different* police report involving the same football player at an earlier point in his USU career. That report detailed yet another set of very serious and disturbing allegations of criminal Sexual Misconduct. When questioned by the Department about what the University did in response to this earlier police report, OOE personnel indicated that as late as June 2024, over a year after receiving the report, they had not taken any steps to investigate the earlier allegations. These additional separate criminal allegations also were not investigated as part of the external investigation that culminated in the June 5th Report. Because no investigation occurred, to date, the University is not aware whether any football program or Athletics Department staff had knowledge of these earlier criminal allegations and failed to report them to the OOE.

Before USU received the police report connected to the Spring 2023 allegations, and approximately a month after the IR reporting the football player's arrest, USU case files reveal that another IR was sent to the OOE with information relevant to the Spring 2023 allegations. An employee involved in student conduct matters reported that, in an unrelated student conduct matter, text messages had surfaced that suggested that Anderson had spoken with the alleged victim from the Spring 2023 allegations and vaguely stated that she was writing some kind of a letter that related to Title IX. This report put the OOE on notice of allegations that Anderson may have violated Policy 340. Instead of promptly reaching out directly to Anderson to ask him what he knew about the 2023 allegations against the football player and whether he did, in fact, speak with the alleged victim, the OOE told the DOJ that it did nothing with this information for nearly a month. And even then, the OOE did not interview Anderson directly, but instead asked Crosbie to gather information from Anderson about his knowledge of the 2023 allegations and report back to the OOE.[12] Crosbie's inquiries at this time were yet another opportunity for Anderson to share his investigative efforts, as well as for Crosbie to share with the OOE that she

---

[12] Throughout the DOJ's compliance monitoring, the OOE has consistently failed to speak directly with Anderson and other relevant football program staff about Title IX incidents involving the football team, even when gathering information about the knowledge and actions of coaching staff. This is contrary to the OOE's approach of speaking with other head coaches about team related incidents or employees about matters that implicate them. This dichotomy raises repeated questions about the OOE's willingness or ability to hold the football program athletes and personnel accountable for their actions. It also has heightened and reinforced the Department's concerns about a hostile environment within the football program.

was aware that Anderson had spoken with and obtained a statement from the alleged victim. Instead, OOE case files show that Crosbie shared with the OOE an imprecise timeline Anderson relayed to her about when he learned of the arrest and spoke to the football player. When interviewed as part of the external investigation, Crosbie indicated that Anderson did not share with her any additional information about his investigation for her to provide the OOE at that time. *See id.* at 15.

Notes in the OOE case file show that OOE staff had ongoing concerns that Anderson may have known more about the allegations than he revealed to Crosbie and thus to the OOE. Over a month after the OOE received Crosbie's account of Anderson's knowledge about the matter, and over two months since the OOE received notice that Anderson may have communicated with the alleged victim, the OOE and University counsel engaged the outside investigator to conduct an independent review of whether USU employees complied with USU Policy 340 and its associated procedures. More specifically, the University asked the investigators to conduct a factual investigation of which employees learned of allegations of Sexual Misconduct and/or criminal conduct of the football player, how the employees learned about these allegations, and whom they told. *Id.* at 1.

The University told DOJ that the external investigation began, in earnest, three and a half months after the OOE received notice that the football player had been arrested for engaging in criminal Sexual Misconduct. The outside investigators issued the June 5th Report approximately 11 months later. OOE staff and University counsel informed the Department that they did not designate a specific timeframe for the independent investigators to complete their work and issue a report. And while USU checked in on the outside investigators' progress, the University did not get any advance notice of the findings and so did not otherwise address the conduct revealed in the report before it was issued. As a result, it was well over a year between the time the University had notice of possible failures of football coaching staff to report known allegations of criminal Sexual Misconduct and when USU finally took employment actions to remedy not only the egregious Policy 340 violations committed by football program and Athletics Department staff, but also to address a culture and climate within the football program and Athletics Department leadership where football players received different, more favorable treatment than others alleged to have committed Sexual Misconduct at USU.

In sum, the OOE failed in its obligation under Title IX and the Agreement to respond promptly, equitably, and effectively to notice that Anderson may have been in contact with the alleged victim of the Spring 2023 incident. Certainly, the University may seek an impartial external investigation as part of its Title IX response. The University had an obligation, however, to respond promptly to the information it received, which would have required it to take steps beyond merely referring the matter to an outside investigator and waiting a year for the investigative report before taking any action. It is unclear why the OOE did not speak directly with Anderson as well as other football coaching and Athletics Department staff to ask what each knew about the Spring 2023 allegations. If the University had done so, USU would have learned of these egregious violations within weeks of them occurring and could have reacted

swiftly. But the OOE failed to communicate promptly and directly with Anderson, other football coaching staff, and Athletics Department leadership and ask the relevant questions. This resulted in the University, for a full year, allowing a head football coach and Acting Athletic Director the latitude to make up their own rules and procedures applicable to football players who faced allegations of Sexual Misconduct. The University's delayed response also left a team of football players with the sense that they were special, subject to a different, more favorable set of rules.

### b. October 2023 Football Player Training

Unsurprisingly, the decisions by football coaching staff and former Athletics Department leadership to subject football players to a more lax set of Title IX rules permeated the culture of the football program. This was evident on October 23, 2023, when an OOE Prevention Specialist delivered a Sexual Misconduct training to a portion of USU's football team, who were accompanied by a football support staff member. The next day, the Prevention Specialist filed an IR detailing the inappropriate, disrespectful, and sexually hostile behavior exhibited by football players at that training. The IR stated that throughout the training, football players collectively jeered, snickered, laughed, and repeatedly interrupted the training with offensive sex-based commentary. As noted in the OOE's case file, the behavior exhibited by the football players in that training is yet another indication of a toxic culture and climate and example of disrespect by the football team members for the University's efforts to comply with Title IX and the Agreement.

The IR reveals that the training began with a football player interrupting the Prevention Specialist's presentation to ask how long the training would be. When told the training would last 75 minutes with appropriate player participation and respect, the football player then boldly held a timer in the air, which he said he would set to let the presenter know when she needed "to wrap up." When the trainer spoke about examples of sexual harassment, players joked and laughed, engaging in numerous inappropriate side conversations. These conversations suggested the football players normalized the treatment of women as sexual objects, the engaging in sexual contact without consent, and the idea that Title IX did not apply to them. When the trainer turned to a discussion of behaviors in healthy relationships, the same football player disrespectfully shouted "sex" in response to every question or scenario posed. When asked about healthy ways to deal with breakups, the same football player yelled "I just go and have sex with more women. Like so many. That is how I get over it." When discussing incapacitation and consent, one football player yelled "when in doubt pull it out." The trainer tried to pull the training back together to emphasize that if there is any doubt about their partner's consent, they should not engage in sexual activity in the first place. The presenter explained that if coercion, force, or incapacitation are present, then consent is not present. In response, one of the football players who had been repeatedly disruptive said, "So we should all just be celibate. No sex for any of us during the season." As the trainer neared the end of the training, the football player with the timer held it up and said loudly that the presenter needed to wrap it up. Throughout the training, the football program staff member present failed to set expectations with the student athletes in real time, only offering up remarks like "let's just get through this" or "let her move on."

According to the IR, when the trainer asked the football program staff member how he felt the training went, he responded, "About how I expected. These guys are just like that." He indicated that the next group of football players to be trained are usually better, but with this group, they just had "to get it over with." Following the training, the trainer reported feeling "disrespected, triggered, and disappointed," stating she felt "uncomfortable throughout the training in a way I typically do not." She also shared her impression that "the team (and the coach) did not understand the importance of this training, nor care to understand it." She further stated, "[t]hey did not show me respect as a representative of the [OOE]" and shared her belief that their conduct in the training needed to be addressed.

In response to the IR, the OOE immediately reached out to USU's new Athletic Director, Diana Sabau, about what happened at the training. Sabau took swift action, speaking with the coaching staff and team to set expectations with the entire football team. Sabau reported relaying to the football team and coaching staff that "this behavior was not appropriate, acceptable, and not within the value system of the team." At the next football team training two days later, a member of the football team apologized to the Prevention Specialist for the team's behavior.

However, given the backdrop of years of concerns about the culture and climate within the football program that the Department has shared with the University, there were notable missteps in USU's response to this additional evidence of a sexually hostile environment. First, despite a football support staff member being present at the training and the Prevention Specialist providing an attendance list and descriptions of certain football players who made particularly offensive remarks or who repeatedly interrupted the training, the OOE did not work with the Athletics Department to identify the athletes she described to hold them personally accountable for their disruptive and disrespectful conduct. A note in the OOE case file indicates that the respondents are "unknown" and that "the only known information is that the RPs are members of the USU football team." But the OOE could have identified the particularly offensive and disruptive attendees with minimal investigation. Notably, in other case files the Department has reviewed, the OOE has worked to identify individuals who have engaged in similar kinds of harassment in comparable forums, like online trainings or chat groups. This failure was a missed opportunity to demonstrate to the football team that displays of disrespect in Sexual Misconduct trainings are inappropriate and will not be tolerated.

Second, while the Title IX Coordinator attended the second football team training to personally observe the conduct of the student athletes, no one from the Athletics Department leadership nor any senior football coaching staff attended. Following a training that raised significant compliance concerns, this was yet another missed chance for the Athletics Department and football program to address the hostile environment by demonstrating to its football players the seriousness with which they all must treat issues related to Sexual Misconduct. Additionally, the Athletics Department and football coaching staff should have considered including a member of the OOE staff when they spoke to the entire football team to set expectations. Finally, nothing in the case file shows that the football team staff member who attended the training was counseled about his failure to set expectations for respectful behavior

from the football players in the training he oversaw. As repeatedly conveyed by the Department to USU, as part of the OOE's efforts to change the culture within the football program, it must be willing to directly address football program coaches and staff.

### III. Conclusion

The Department acknowledges the work that USU has put into implementing the Agreement since it took effect in February of 2020 and notes that the University has taken several responsive steps since it received the June 5th Report. The University terminated the employment of four Athletics Department staff who the University found to have violated USU policies related to reporting of Sexual Misconduct, and issued strong public statements emphasizing the importance of employees fulfilling their reporting responsibilities to ensure USU can address Sexual Misconduct in its community and prevent its recurrence. We also understand that, in response to a recommendation by DOJ, the University has engaged an external trainer with expertise working with student athletes and is working on developing smaller, targeted trainings for USU student athletes and staff.

Yet significant work remains to be done to address ongoing issues with USU's response to Sexual Misconduct related to the Athletics Department, and the football program specifically. Consistent with Section IX.B of the Agreement, the University has 45 days to take action to correct the areas of noncompliance identified in this letter. The Department has already recommended certain corrective actions the University can take, including, but not limited to, emphasizing in its upcoming Reporting Employee training the prohibition against Reporting Employees conducting their own investigations; developing an internal protocol to guide the OOE's assessment of and response to culture and climate issues within certain Departments and programs; directly and promptly communicating with Athletics Department staff, including coaches, when it receives allegations involving student athletes; continuing to tailor training for athletes and Athletics Department employees that is customized to address specific circumstances and concerns; engaging Athletics Department leadership in development and delivery of the training; and ensuring that the leaders of its football program, in cooperation with the OOE, send clear, consistent, and firm messaging that Sexual Misconduct will not be tolerated and any allegations of such misconduct will be reported timely to and addressed appropriately by the OOE. Additionally, under Section III.C.9 of the Agreement, USU must establish criteria for and a process by which the Title IX Coordinator and the Athletics Department will determine appropriate interim measures during the grievance investigation and adjudication process, as well as enhanced coordination between the OOE and the Athletics Department.

The Department requests that, within 45 days of receipt of this letter, the University submit in writing to DOJ a summary of all actions taken to correct the areas of noncompliance identified, as well as any supporting documentation. As always, the Department appreciates the University's cooperation and looks forward to continuing to work collaboratively with USU as it strives for full compliance with Title IX and our Agreement.

Sincerely,

_____  
Shaheena Simons, Chief  
Amanda Dallo, Deputy Chief  
Victoria Lill, Trial Attorney  
Brigid Benincasa, Trial Attorney  
Christine Bischoff, Trial Attorney  
Educational Opportunities Section  
Civil Rights Division  
U.S. Department of Justice  

_____  
Amanda Berndt, Chief  
Civil Division  
United States Attorney's Office  
District of Utah